# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT NASHVILLE

### AUGUST SESSION, 1998

FILED

December 11, 1998

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | **C.C.A. NO. 01C01-9710-CR-00451** |
| | ) | |
| Appellee, | ) | |
| | ) | |
| | ) | **DAVIDSON COUNTY** |
| **VS.** | ) | |
| | ) | **HON. J. RANDALL WYATT, JR.** |
| **ANTHONY HODGES,** | ) | **JUDGE** |
| | ) | |
| Appellant. | ) | (First Degree Murder, |
| | ) | Aggravated Child Abuse) |

## ON APPEAL FROM THE JUDGMENT OF THE CRIMINAL COURT OF DAVIDSON COUNTY

FOR THE APPELLANT:

JEFFREY A. DeVASHER
Assistant Public Defender
(On Appeal)

KARL F. DEAN
Metro Public Defender
(At Trial)

RICHARD TENNENT
Assistant Public Defender
(At Trial)

1202 Stahlman Building
Nashville, TN 37201

FOR THE APPELLEE:

JOHN KNOX WALKUP
Attorney General & Reporter

KENNETH W. RUCKER
Assistant Attorney General
425 Fifth Avenue North
Nashville, TN 37243

VICTOR S. JOHNSON
District Attorney General

BILL REED & LILA STATOM
Assistant District Attorneys
General
Washington Square, Suite 500
222 Second Avenue North
Nashville, TN 37201

OPINION FILED _____

AFFIRMED

DAVID H. WELLES, JUDGE

# OPINION

The Defendant, Anthony Hodges, pursuant to Tennessee Rule of Appellate Procedure 3(b), appeals his convictions and sentences for first degree felony murder and aggravated child abuse. We affirm both the convictions and sentences.

Defendant assigns seven points of error from the proceedings below: (1) the trial court improperly denied Defendant's motion to suppress his statement to police, (2) the trial court erred by not requiring the State or the jury to elect a factual theory, (3) the trial court improperly refused to allow Defendant to present evidence that his severed co-defendant had abused the victim in the past, (4) the evidence was insufficient to convict Defendant of felony murder and aggravated child abuse, (5) the trial court improperly instructed the jury regarding criminal responsibility, (6) the trial court improperly denied Defendant's motion to strike the State's proposed aggravating factors for sentencing, and (7) the trial court improperly applied the maximum sentence available for aggravated child abuse.[1]

In February 1996, Defendant Anthony Hodges, and his wife Kena Hodges, were indicted by the Davidson County Grand Jury on one count of murder committed during the perpetration of aggravated child abuse in violation of Tennessee Code Annotated § 39-13-202(a)(2) and one count of aggravated child

---

[1] We address these issues in different order.

abuse and neglect in violation of § 39-15-402. The Defendant successfully moved to sever his trial from that of his wife and co-defendant; and following his trial in January of 1997, a jury returned guilty verdicts on both charges. The jury sentenced Defendant to life imprisonment without the possibility of parole for felony murder, and the trial court sentenced him to twenty-five years for aggravated child abuse, to be served concurrent with his life sentence. The trial court denied Defendant's motions for a new trial, for judgment of acquittal, for a new sentencing hearing, and for imposition of life with the possibility of parole; and Defendant timely appealed.

## I. SUFFICIENCY OF THE EVIDENCE

We first address the sufficiency of the evidence in order to review the facts presented by the State at trial. Defendant contends that the evidence was not sufficient to convict him of felony murder or aggravated child abuse—on either a theory that he was the principal perpetrator or a theory that Kena Hodges inflicted the abuse and Defendant is criminally responsible for her actions. We disagree.

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact beyond a reasonable doubt." Tenn. R. App. P. 13(e). In addition, because conviction by a trier of fact destroys the presumption of innocence and imposes a presumption of guilt, a convicted criminal defendant bears the burden of showing that the

evidence was insufficient.  McBee v. State, 372 S.W.2d 173, 176 (Tenn. 1963); see also State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992) (citing State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1976), and State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977)); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); Holt v. State, 357 S.W.2d 57, 61 (Tenn. 1962).

In its review of the evidence, an appellate court must afford the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." Tuggle, 639 S.W.2d at 914 (citing State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).  The court may not "re-weigh or re-evaluate the evidence" in the record below.  Evans, 838 S.W.2d at 191 (citing Cabbage, 571 S.W.2d at 836).  Likewise, should the reviewing court find particular conflicts in the trial testimony, the court must resolve them in favor of the jury verdict or trial court judgment.  Tuggle, 639 S.W.2d at 914.

*A. Facts*

In this case, the evidence clearly establishes that the young victim, Miyoshi Richardson, died of blunt force trauma as a result of intentional blows to her head and torso.  In addition, it is decisively apparent that either the mother, Kena Hodges, or the step-father, Defendant, inflicted the fatal injuries and that the victim was in the sole custody of Defendant throughout the day of her death.  The State could not show, however, which person—if only one—actually administered the blows; but it argues that it nevertheless met its burden of proof.

1. Proof of Injury

Metropolitan Nashville and Davidson County police officers testified that they were dispatched to Defendant's home at approximately 5:00 p.m. on December 28, 1995. A paramedic unit was present at the scene when the officers arrived, but medical personnel were preparing to leave. The officers observed the victim, a twenty-eight month old child, on a couch as they entered the home. At that time, officers observed that the child was already stiff with rigor mortis, had the appearance of having been deceased for some time, had a large bruise with swelling on the left side of her face, and had dried blood in one nostril. The officers moved the victim to a back bedroom while awaiting the medical examiner.

Officers confiscated several items of physical evidence from the residence, including a bed sheet, a pair of pants, a towel, a diaper, a cotton pad, a sponge, and a child's sweat shirt. Testing by the Tennessee Bureau of Investigation (TBI) revealed the presence of blood on these items.[2] Officers also seized a coat hanger that had been bent and secured with tape, which was hanging on a hook in the victim's room. While the State characterized this hanger as evidence of punishment, the defense argued that it may have been simply a tool for turning on lights above the child's reach. In addition, the State presented evidence of other items taken from the house, including a mop, that it characterized as having

_____

[2] Only one item contained enough blood to determine identity. The blood on that item— the shirt—belonged to the victim.

-6-

been used to clean the home. The mop was wet when seized, but the TBI found no traces of blood on it.

The medical examiner, a forensic pathologist, examined the victim's body at the scene of the crime, after another representative from the examiner's office had pronounced the child dead. Photographs introduced at trial depicted bruising of her skin along the left side of her face, with abrasions on the side of the face and around the eye, and bruising apparent on her arms and legs. The doctor testified that the victim also had a laceration inside her left nostril and on the inside of her upper lip, and additional abrasions on her hands and legs.

The next day, the medical examiner performed an autopsy on the victim and determined that she died as a result of blunt force injury of the head and torso. Several more contusions, lacerations, and abrasions were found over various parts of the victim's body, including her chin, lower lip, ear, abdomen, buttocks, knee, heel, tongue, and hands. The doctor testified that all external manifestations of injury were consistent with blunt force-type trauma, and that injuries to the child's hands were characteristic of defensive wounds. Finally, areas of the victim's scalp were visible through her hair, indicating that her hair may have been pulled from her head.

Upon internal examination, the medical examiner ascertained that the victim suffered hemorrhaging underneath the scalp; between the brain and skull, underneath the protective membrane of the brain; and on the surface of the brain

itself. Hemorrhaging also appeared around the optic nerves and within the eyes themselves. The victim's liver was lacerated and contained areas of hemorrhage. All internal injuries remained consistent with blunt force trauma, and hemorrhages of the victim's eye region were compatible with injuries received from violent, forceful shaking. The doctor concluded that the victim's death resulted from multiple blows to the child's head and torso, and that the blows were intentional—they were inconsistent with any type of accidental injury.

The doctor then testified regarding the victim's probable status during the day of her death. He opined that, while conscious, the victim would likely have been irritable from likely headache and nausea, with increasing lethargy and decreasing activity. Next, the child would have slipped into unconsciousness, followed by coma and then death. Although the doctor could not determine the exact time that death occurred, he estimated that, based upon the extent of rigor mortis present at his 5:30 p.m. examination, the victim had been dead for at least several hours up to twelve hours or longer. According to the medical examiner, if the child's injuries had been inflicted at or before approximately 6:00 a.m. on the day of her death, the bruises would have been visible and apparent by noon, and probably much earlier.

2. Statements by Anthony and Kena Hodges

The primary proof presented by the State to show how, when, and by whom the injuries to Miyoshi were inflicted was gleaned from the sometimes consistent, sometimes conflicting statements by Anthony and Kena Hodges to

police. Detective Kent McAlister of the Metropolitan Police Department testified concerning many of the statements made by the Hodges.

Defendant related that he and the victim had been alone together throughout the day of her death. Kena Hodges left the home for work at approximately 6:30 a.m. and did not return until shortly before 5:00 p.m. McAlister stated that, at the scene, Defendant explained the child's facial bruises by telling officers she had fallen off of the commode earlier in the day. Separately, Kena stated at the scene that the child had fallen in her presence that morning, hitting her head on the bathroom heater.

McAlister requested the Hodges to appear at the Criminal Justice Center later the same evening for extended interview, which they did. In that interview, Defendant told McAlister that early in the morning, while Kena prepared for work, he heard a "boom" from the bathroom. According to Defendant, Kena told him that the child had fallen and hit her head on the bathroom heater, burning her hair. During this statement, Defendant denied seeing this first fall and stated that the victim acted normally after it occurred, although she did not cry or complain, as she usually would.

In addition, Defendant informed McAlister that around 10:00 a.m., he saw the victim stumble once, and he placed the victim on the commode because she had partially soiled her clothes. While the victim was in the bathroom, Defendant walked to the kitchen to feed their dog. When he heard a loud noise from the

-9-

bathroom, he returned to find the child lying on the floor. He stated that though she appeared to be all right, she fell again while trying to walk out of the room. Following these falls, Defendant noted that the victim appeared sleepy and less responsive, and she seemed "in a daze." He then put the child to bed. Defendant spoke with his wife by telephone between 10:00 and 11:00 a.m., and he informed her that the child had fallen and seemed extremely sleepy. According to Defendant, Kena reassured him that the child was merely tired because she hadn't had much sleep the night before.

Kena telephoned Defendant at approximately 12:30 p.m., and Defendant informed her that the child was still sleeping. In his statement, Defendant told police that he was then worried about Miyoshi because he thought she should be awake. Kena reportedly again told Defendant to let the child sleep—that she was tired. Kena called back at approximately 2:00 p.m., at which time Defendant told her the victim was still sleeping and that he wanted to wake her. He took a wet towel and squeezed it over her face and told his wife that "it looked like she moved her eyes." Kena again told Defendant the child was just sleepy, but he told Detective McAlister that he knew something was wrong:

> And I said . . . something just don't seem right because she normally be up because I at this point I had my stereo on in the living room I said music is up and I said the dog been barking you know I said there's commotion going on and my wife said well go get her. So I went to the bed, got her, brought her out and my wife was on the other line and my wife I said well baby you talk to her maybe you can call her and maybe she'll respond and my wife started you know Miyoshi, Miyoshi, Miyoshi, Miyoshi and I said it look like she moving and my wife said well check her temperature and she told me the thermometer which we have a home thermometer is in the . . .

bathroom cabinet so I went back to the cabinet and got the thermometer cleaned off, put it in her mouth, flushed it.

. . . . . . . It seemed like she was [responding] and my wife just kept because my wife was, you know, coaching me more or less along because I told my wife she shouldn't be asleep this long. My wife kept telling me she's tired, she's sleepy. I said she shouldn't be asleep this long.

When asked how she seemed to be responding, Defendant told Detective McAlister that "[s]he would open her eyes just like vaguely, like a sleepy . . . look, partially like you know vaguely just open them with a sleepy look." During the same conversation with his wife, Defendant remarked that he thought Miyoshi might have had a seizure because it looked as though she had been biting her tongue. According to Defendant, Kena told him the child had not had a seizure and to put her to bed. Defendant therefore put the victim back to bed. He denied noticing anything unusual about her appearance other than her lack of responsiveness. When asked about the discoloration of her face, he stated that he assumed she bruised herself in the falls, but that he did not notice when the bruises appeared on her face.

Kena Hodges arrived home shortly before 5:00 p.m. and attempted to wake the victim. In his statement, Defendant told McAlister that "she started playing with the baby's like legs she said the baby is some kind of, you know, medical term word she used I don't know, she said the baby is well tight." They called the child's grandmother to tell her the child was dead. They then called 911. Defendant stated that after the paramedics informed the Hodges that the child was conclusively dead,

. . . it hit home and, you know, I was breaking down at that point and she was strong. She was telling me, baby, you know, it was my fault. I was saying, baby, it's my fault cause I should have had, you know, when the baby fell out a couple of times called the, you know, ambulance then and what not.

Defendant gave another statement to police the next night, December 29, 1995. During that statement, Detective McAlister informed Defendant that the victim died from being beaten, not from falling, and implored him to tell police what had happened the previous day. Defendant immediately denied beating the child, and he admitted that Kena sometimes acted abusively toward Miyoshi. When asked the last time he remembered Kena "over discipline" the victim, Defendant responded, "Thursday morning," the day of her death. He stated, "I honestly don't believe she just fell I mean it was a throw . . . ," and he indicated that he heard Kena say to the child in the bathroom, "Get the f__k out of here you mother f__kin' bitch. I'll kick your f__king ass."

Defendant continued to repeatedly maintain that he did nothing to harm the victim, and he explained his scraped knuckle and bruised toe by insisting that he helped his neighbor move several large appliances the day before Miyoshi died. When pressed again, the following exchange occurred:

ANTHONY: Earlier in the morning my wife well my wife was abusive with her. . . .

MCALISTER: What'd she do?

ANTHONY: First she hit her in the sink. I was in the bed sleep and I know she hit her head on the side of the coming out of our bathroom there is a fire well fireplace, no heater and you know boom, I heard the noise. . . .

MCALISTER:      . . . [T]ell us what happened, tell us what you saw?

PINKERTON:      What kind of conversation and what did you see?

ANTHONY:      I seen her with her hair going to the door. I mean it's like, get your ass up, you know and boom

MCALISTER:      Boom what?

ANTHONY:      Kicking her[.]

MCALISTER:      Kicking her where?

ANTHONY:      From the bathroom[.]

MCALISTER:      Kicking her where did she kick her on her body?

ANTHONY:      In her in her ass or between her legs or whatever because it tipped up out into the bedroom.

PINKERTON:      So where did she, where did she land when she fell when she got kicked out of the bathroom?

. . . .

ANTHONY:      I have a, what is it, a milk crate. I have an old milk crate. It was closer down. I use it as a night stand. She hit that and moved it back.

PINKERTON:      What part of her body hit the milk crate?

ANTHONY:      Well she was upside down. She had flipped and so the milk crate was like moved and I moved the milk crate back in the corner.

PINKERTON:      And what time of morning was this?

ANTHONY:      Is [sic] was about six-fifteen right before she had to go to work. Six something.

MCALISTER:      So she kicked her one time.

. . .

ANTHONY:      No she was pretty abusive.

-13-

MCALISTER:     Well explain to me what pretty abusive is. Would you please explain that to me. I guess I'm just dumber than a rock.

ANTHONY:     She made the baby stand up in the corner all night.

. . .

PINKERTON:     Which night are we talking about?

ANTHONY:     We're talking about Wednesday, Thursday, Thursday morning.

PINKERTON:     Talking about the night before the baby's death.

ANTHONY:     Right. She made the baby stand up in the corner and hold her hands up on the wall.

PINKERTON:     Why? Why did she say she done that? Why?

ANTHONY:     The baby girl said she had to pee and then so she slept in the corner all night.

PINKERTON:     Standing up? What did you say about that?

ANTHONY:     Baby put the baby to bed.

. . .

ANTHONY:     Okay. F__k you you don't have nothing to say about, you know. I said, baby, put the baby to bed. . . .

PINKERTON:     So y'all slept in the bed and the baby standing in the corner

ANTHONY:     With her hands up.

PINKERTON:     When did you notice that she got up and the baby was out of the corner?

ANTHONY:     I noticed possibly all night one o'clock, two o'clock, three o'clock, she'd holler at the baby, are you ready to say something, you ready to say something. She would get up and get her normal[.]

PINKERTON:     Get up and get what? We don't know what normal is.

ANTHONY: Smack the baby, hit the baby. You can't say you gotta go to bed, you can't say you gotta go to the bathroom.

PINKERTON: When she hit her after she was standing and you woke up one of those few times you woke up and she was hitting her, when she slapped the baby where did the baby hit? Did she hit her head on anything else? Or did she just slap her and the baby just stood still or did she fall down or what?

ANTHONY: She was constantly falling. Constantly giving up.

. . .

PINKERTON: How often did this happen?

ANTHONY: Too much.

Upon cross-examination, Detective McAlister testified to several statements made by Kena Hodges over the same time period—the evening of her daughter's death, December 28, 1995, and the next night, technically the early morning hours of December 30, 1995. During her first interview, Kena told McAlister that Miyoshi had fallen and hit her head on the bathroom heater. Later, when apparently confronted with Defendant's statements inculpating her,[3] Kena denied ever kicking the victim, yet she admitted inflicting some harm. Kena told detectives that she had struck the child lightly with a plastic coat hanger, causing her to fall and hit her head against the bathroom sink.

In her statement, Kena expressed disbelief that her actions caused the child's death, but she accepted responsibility if that were indeed the case. McAlister testified to her words:

_____

[3] The transcript of Kena's interview begins abruptly, and the record does not reflect the conversation prior to the beginning of what has been recorded; but Kena has clearly been informed somehow of allegations that she kicked the child.

-15-

"I'm hurt. Don't think I'm not hurt. And I feel bad, because, like I said, I don't believe that that's what did it to her, but I guess it did, so I'm wrong. . . . I was thinking of anybody and anything but me. I couldn't believe this was me, but I'm being honest. It's not enough to say, I'm sorry. It's not enough to say, I didn't think that would happen.

. . . .

I didn't think that would result from that. It's not enough. It's not enough and you're right. And it's not enough for me to say that I should have, would have, could have. It's not enough. Her life is gone, and I'm being honest. True enough, I don't -- I don't think I was a negligent Mama. I guess I was negligent then. Abusive, I don't think I was abusive, but I guess I was abusive then. I don't think I was a bad parent. I made a mistake and I'm wrong. I guess I've got to pay for it. I hate to be honest, you know, I guess this is going to be said in court, played in court, whatever. I'm being honest in my heart. Don't think I don't feel bad. I have felt bad since it happened. I'm truly a Christian, but I make mistakes. I do wrong. This was one, true enough. Hey, you-all are saying it's a biggie. It is a biggie. I do feel bad. Now, I'm not going to say I want you-all to just believe me. I'm not going to sit here and just lie and say, hey. But, now, I guess if I did -- did it, I'd be, I guess I'll keep saying it, if because I still don't want to believe that, it was me. But if I did it, I did it, and I'm wrong. I'm not trying to pass the buck. I'm not trying to point fingers, and I'm not going to steer you wrong."

Officers asked Kena why she failed to admit the prior night that she hit the victim with a coat hanger, and she responded that she blocked the incident out of her mind because she did not believe she caused harm to the child:

"I guess I want to block that out. I did not even remember that, but after I sat there, I thought about it and say, you know, what now, that I think about it. Three blows to the head. It might have been just me, now that I think about it, after I thought about what really happened."

McAlister testified that, to his knowledge, Kena had not mentioned before that she hit her daughter three times. Finally, the detective testified to Kena's words shortly before police arrested her: "'Jesus, I am so sorry, Miyoshi. I never wanted

to do nothing to you. How many years does a person go to jail for something like this?'"

Upon redirect examination of Detective McAlister, the State presented evidence that at the first interview, in response to the question of whether Defendant had struck the victim in a harmful manner, Kena stated,

> "No, and that was much -- we loved Miyoshi, like I said, and you know, but this incident, he called me during the day, because he wanted for me to reassure him, because he's like I said, he's real nervous about this, so he didn't know -- so he just went on what I said, like I said, feel bad because I feel I should have did more, but like I assume, she asleep, you know . . . ."

To impeach the credibility of Kena's statements implicating herself, the State also introduced Kena's earlier statement that she did not know exactly where or how the victim fell in the bathroom: "I guess that's when she fell. I can't say I saw it . . . ." In addition, the jury heard this account by Kena through McAlister:

> "I said, Baby, don't worry about it. Should I call the ambulance? I was like, Baby, no. I said, no, and I admit that, because I'm thinking, there ain't nothing wrong with her. And that's the honest truth, and I was telling everybody on my job, well, my husband was nervous about my daughter. And if you ask him, he's a little nervous about her, but I don't think wrong [sic] with her. Betty punches me to herself, and says, get over -- and says, get over it. She's fine. He's just overreacting. And I don't know. And so then I was telling him little things to do to her and stuff to try and hear her. I was like, well Baby, take her in the tub and lay her in the tub and just take a little cold water and put it on her belly. That will probably make her squint, you know, if the temperature. No, Baby, it's too cold to do that. I don't want to make her cold. I said, okay, well, that's understandable, you know.
>      . . . .

And so, I said, well, Baby, I don't think nothing wrong. I think she fine. You're just overreacting."

The general substance of this telephone call and another that day were verified by Kena's co-worker, who heard Kena speak. According to Kena's statement, Defendant called her back soon thereafter to request her to come home as soon as possible because of the child's condition. Regarding pain or marks on the victim, Detective McAlister testified that Kena stated,

"Like I said, I did not notice those things before I had left. I didn't see them, and I didn't do them, and I didn't see him do any while I was there. I don't believe he did while I was not there. I didn't see it and he didn't tell me if he did. . . . Like you-all are saying, you trying to figure out whether it was him, or whether it was me, and I'm trying to be like, I know for a fact it wasn't me."

Finally, the State introduced this conversation between police and Kena: "'Who's been doing it?' . . . 'It was not me.' . . .'Who's been doing it?' . . . "Him.'"

*B. Legal Analysis*

Defendant was convicted of aggravated child abuse in violation of Tennessee Code Annotated § 39-15-402(a)(1) and first degree murder in violation of § 39-13-202(a)(2)—specifically, murder committed during the perpetration of aggravated child abuse. We will address the murder conviction first.

Defendant argues that his conviction for murder during the perpetration of aggravated child abuse should be reversed because the evidence was insufficient to show (1) that he inflicted the abuse upon the victim, or (2) that he was criminally responsible for Kena's infliction of injury upon the child. We

conclude that the evidence was sufficient for the jury to find Defendant guilty as the principal perpetrator of felony murder. We further find that even if the jury believed Kena Hodges inflicted the fatal blows, the evidence is nevertheless sufficient to convict Defendant based upon his subsequent neglect of the victim and his criminal responsibility for Kena's conduct.

### 1. Felony Murder by Infliction of Injury

At the time of this offense, Tennessee Code Annotated § 39-13-202 read in part: "First degree murder is . . . [a] killing of another committed in the perpetration of or attempt to perpetrate any . . . aggravated child abuse." Tenn. Code Ann. § 39-13-202(a)(2). The legislature prescribed that "[a] person is guilty of the offense of aggravated child abuse who commits the offense of child abuse as defined in § 39-15-401 and . . . [t]he act of abuse results in serious bodily injury to the child." Id. § 39-15-402(a)(1) (emphasis added). In turn, the cross-referenced § 39-15-401, entitled "Child Abuse and Neglect," stated:

> Any person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury or neglects such a child so as to adversely affect the child's health and welfare is guilty of a Class A misdemeanor; provided that if the abused child is six (6) years of age or less, the penalty is a Class D felony.

There can be no question that a killing has occurred within the meaning of § 39-13-202(a)(2). Likewise, there can be no mistake that an act of abuse has resulted in serious bodily injury within the meaning of § 39-15-402(a)(1). Defendant disputes neither statement; he acknowledges in his brief,

> Taken in the light most favorable to the State, the evidence at trial established either that (1) the defendant's co-defendant, Kena

Hodges, inflicted the injuries that caused the victim's death, while the defendant was awake and aware of such abuse, made no attempt to stop said abuse, and made no effort to obtain medical assistance for the victim; or (2) disregarding Kena Hodges' confession, the defendant inflicted the injuries that caused the victim's death, her injuries being consistent with being struck with rings the defendant may have been wearing on his hand(s); or (3) some combination of the two theories outlined above.

Turning to a facet of greater dispute, therefore, we examine whether the proof established Defendant's guilt as the deliverer of physical blows. Defendant, by his own admission, cared for the victim alone between the hours of approximately 6:30 a.m. and 5:00 p.m. The mother, Kena Hodges, did not recall noticing any signs of physical injury to the child prior to leaving her in Defendant's care. The jury viewed photographs of Defendant's bruised toe, scraped knuckle, and the rings he normally wore. The jury heard Defendant's statement, in which he recounted that the victim had soiled her clothes during the day, and could have surmised that the incident provoked him. Although Kena admitted to having struck the child in the morning hours, the jury also heard, by her statement to police, that she did not believe she could have caused such severe injuries. In addition, Defendant conceded that the victim had been further injured while in his care by falling at least twice, including once from the height of a commode.

Our supreme court has long stated, "[T]he weight to be given circumstantial evidence and "'[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'"" State v. Mann, 959 S.W.2d 503,

518 (Tenn. 1997) (quoting <u>Marable v. State</u>, 313 S.W.2d 451, 457 (Tenn. 1958) (quoting Wharton's Criminal Evidence)). We conclude that it was within the jury's purview to find Defendant guilty of battering the victim while alone with her the day of her death. <u>See generally</u> <u>State v. Donald Ray Lacy</u>, No. 02C01-9701-CC-00013, 1997 WL 729261 (Tenn. Crim. App., Jackson, Nov. 25, 1997) (finding circumstantial evidence sufficient to convict of felony murder by aggravated child abuse when victim was in defendant's sole care); <u>State v. Cynthia & Rhodney Roberson</u>, No. 02C01-9503-CC-00059, 1995 WL 765009 (Tenn. Crim. App., Jackson, Dec. 28, 1995) (same); <u>State v. James DuBose</u>, No. 01C01-9405-CC-00160, 1995 WL 504803 (Tenn. Crim. App., Nashville, Aug. 25, 1995) (same), <u>aff'd</u>, <u>State v. DuBose</u>, 953 S.W.2d 649 (Tenn. 1997) (permission to appeal denied on sufficiency issue).

### 2. Felony Murder by Acts of Neglect

Likewise, we find the evidence sufficient for the jury to find Defendant guilty of neglecting the victim within the meaning of Tennessee Code Annotated § 39-15-401(a) and, by incorporation, §§ 39-15-402(a)(1) and 39-13-202(a)(2). As explained above, first degree felony murder is a "killing committed in the perpetration of or attempt to perpetrate any . . . aggravated child abuse." Tenn. Code Ann. § 39-13-202(a)(2). Next, aggravated child abuse is the commission of "child abuse as defined in § 39-15-401" that causes serious bodily injury. <u>Id.</u> § 39-15-402(a)(1). Child abuse, as defined in § 39-15-401, includes "knowingly, other than by accidental means, . . . neglect[ing a child under eighteen] so as to adversely affect the child's health and welfare." <u>Id.</u> § 39-15-401.

-21-

Defendant argues to the contrary. He agrees that the evidence establishes the crime of neglect, but disputes that he was charged with that offense:

> [T]he most that the evidence at trial establishes is that the defendant neglected the victim, an offense with which he was not charged. . . . At the time of the offense, the offense of aggravated child neglect did not exist in Tennessee. Child neglect is a distinct offense from child abuse. Child neglect is not a predicate offense for felony murder.

(Footnote omitted.) (Citing State v. Cynthia Denise Smith, No. 1153, 1990 WL 134934 (Tenn. Crim. App., Knoxville, Sept. 20, 1990.)) In addition, Defendant argues that this Court "held that child neglect was insufficient to support a conviction for felony murder" in State v. Denise Maupin, No. 272, 1991 WL 197420 (Tenn. Crim. App., Knoxville, Oct. 7, 1991); and he argues that the supreme court affirmed this conclusion in State v. Maupin, 859 S.W.2d 313, 315 (Tenn. 1993).

The primary distinction between both Maupin opinions and the case at bar is that the statute at issue in Maupin was not, as Defendant claims, the felony murder statute. See Maupin, 859 S.W.2d at 314. Rather, the problematic statute was Tennessee Code Annotated § 39-2-202(a)(2), which the legislature had recently enacted.[4] Subsection (a)(2), reading,

> It shall also be murder in the first degree to kill a child less than thirteen (13) years of age, if the child's death results from one (1) or more incidents of a protracted pattern or multiple incidents of child abuse committed by the defendant against such child, or if death results from the cumulative effects of such pattern or incidents,

---

[4] At that time, subsection (a)(1) of § 39-2-202 included the collection of offenses that we deem "felony murder."

was determined to be unconstitutional by our supreme court in the case of Maupin's boyfriend, State v. Hale, 840 S.W.2d 307 (Tenn. 1992), decided while Maupin was on appeal to the supreme court.

Despite the obvious and significant difference in the relevant statute, a similarity exists between the "child abuse murder" statute of Maupin and the "felony murder by aggravated child abuse" statute we contemplate here. The child abuse murder statute also did not define "child abuse" within its terms, and courts turned to the statutory offense of child abuse: § 39-4-401.[5] Like § 39-15-401 that we consider in this case, § 39-4-401 was entitled "Child Abuse and Neglect." Section 39-4-401 contained two separate ways to satisfy commission of the offense—by either inflicting injury upon or neglecting a child. Because this Court had previously upheld a conviction for child neglect alone under § 39-4-401,[6] a panel of this Court concluded in Maupin that "child abuse, as proscribed in [the child abuse murder statute], did not include child neglect." Maupin, 1991 WL 197420, at *5.

Turning to the felony murder by aggravated child abuse statute at issue here, however, we respectfully disagree that the legislature did not intend for the term "child abuse" to include child neglect. Throughout our Code, different

---

[5] Section 39-4-401, as considered in Maupin, differed from § 39-15-401, the child abuse statute in force at the time of Miyoshi Hodges's death, because it was strictly a misdemeanor offense, whereas child abuse may now constitute a Class D felony.

[6] When a jury had returned a verdict of guilty as to neglect and not guilty as to infliction of injury, or "abuse." See State v. Cynthia Denise Smith, No. 1153, 1990 WL 134934, at *3-4 (Tenn. Crim. App., Knoxville, Sept. 20, 1990).

concepts, prohibitions, and mandates are expressed in separate sections and subsections. Specifically, our criminal laws are divided into explicit subsections to avoid ambiguity of interpretation. Tennessee Code Annotated § 39-15-401 creates one crime which can be satisfied by two different courses of conduct, not two separate crimes.

When stating, "A person is guilty of the offense of aggravated child abuse who commits the offense of child abuse as defined in § 39-15-401 . . . ," we do not believe our legislature intended to refer only to one half of an unenumerated, uninterrupted, unpunctuated statute subsection, as Defendant would have us conclude. "Child abuse as defined in § 39-15-401" encompasses § 39-15-401(a) in its entirety:

> Any person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury or neglects such a child so as to adversely affect the child's health and welfare is guilty of a Class A misdemeanor; provided, that if the abused child is six (6) years of age or less, the penalty is a Class D felony.

See Tenn. Code Ann. §§ 39-15-402, -401; see also State v. Cynthia & Rhodney Roberson, No. 02C01-9503-CC-00059, 1995 WL 765009, at *6 (Tenn. Crim. App., Jackson, Dec. 28, 1995).

The facts presented by the State support a jury verdict of murder during the perpetration of aggravated child abuse based upon neglect of the victim "so as to adversely affect the child's health and welfare," resulting in serious bodily injury. See Tenn. Code Ann. §§ 39-15-401, -402. Defendant knew that the child

had been forced to stand for hours overnight against the wall, unable to sleep, eat, or relieve herself. Early the next morning, Defendant admitted that he heard a loud boom while Kena and the victim were in the bathroom together. Immediately thereafter, he "seen [sic] her with her hair going to the door"; and the victim flew across the room, hit a milk-crate nightstand, and flipped upside down, landing on the floor. Defendant either knew or strongly suspected that Kena had kicked Miyoshi.

Toward mid-morning, Defendant observed the victim fall at least twice, and he noticed that she was too sleepy to awaken herself, as she would normally do. Closer to midday, Defendant attempted several times to wake Miyoshi, but the victim managed only a slight response, if any. Kena told police that Defendant was extremely distressed about the victim's condition throughout the day, and that at one point, Defendant was alarmed enough to try to hear her heartbeat and feel her pulse. The jury saw photographs in which the child's facial bruises were evident, and medical personnel testified that bruises were apparent when they arrived at the scene.

Defendant knew this child was in serious medical trouble. Defendant took no action to provide medical attention for the child he considered his own. Miyoshi died as a result. Cf. State v. Bordis, 905 S.W.2d 214, 225-26 (Tenn, Crim. App. 1995) (finding that evidence was sufficient to convict of second degree murder where "deterioration [of victim] was evident and the need for medical attention was apparent," yet defendant elected not to nourish or seek

medical assistance). We find the evidence sufficient to permit the jury to convict him of first degree felony murder based upon a theory that Defendant knowingly neglected her so as to adversely affect her health and welfare.

Finally, this same evidence is sufficient to show that Defendant is criminally responsible for the conduct of Kena Hodges. To be criminally responsible, Defendant, "[h]aving a duty imposed by law . . . and acting with intent . . . to promote or assist [the offense's] commission," must have "fail[ed] to make a reasonable effort to prevent commission of the offense." Tenn. Code Ann. § 39-11-402(3). As Miyoshi's step-parent and caretaker, Defendant bore a duty to protect her from harm and provide her with emergency attention. Defendant, although not the victim's legal guardian, was entrusted by her legal guardian to watch over her on a daily basis. We consider this to be a "duty imposed by law" within the meaning of § 39-11-402(3). See State v. Michael Tyrone Gordon, No. 01C01-9605-CR-00213, 1997 WL 578961, at *6 (Tenn. Crim. App., Nashville, Sept. 18, 1997); State v. Jeffrey Lloyd Winders, No. 88-142-III, 1989 WL 105710, at *2-3 (Tenn. Crim. App., Nashville, Sept. 14, 1989). Kena admitted that she struck the child on the morning of December 28, 1995, and Defendant grew increasingly aware of the child's medically severe condition as the day progressed. This proof is sufficient for the jury to infer Defendant's intent to promote or assist in the infliction of injury or neglect of the child.

### 3. Aggravated Child Abuse

Because we have already found the evidence sufficient to find Defendant guilty of aggravated child abuse based upon either a theory that Defendant knowingly inflicted injury on the victim, causing her death, or a theory that Defendant knowingly neglected the child so as to adversely affect her health and safety, causing her death, we need not further address the argument that the evidence is not sufficient to support his conviction of aggravated child abuse. This issue lacks merit.

## II. ELECTION OF OFFENSES

At trial, prior to Defendant's presentation of proof, he moved the court to compel the State to elect one of its two theories of guilt—whether the State wished to proceed on a theory that Defendant inflicted injury upon the victim, or whether Defendant was criminally responsible for Kena Hodges's infliction of injury upon the victim. Defendant also moved for a special jury instruction, which would have advised the jury that its verdict must be unanimous regarding whether Defendant was guilty as a principal or as criminally responsible for Kena. The trial court denied Defendant's motion, and the jury received a standard unanimity instruction at the conclusion of proof. In addition, the State argued strenuously in closing that the jury's verdict need not be unanimous regarding the theory of guilt.

Defendant argues that "[w]hen a defendant is charged with multiple possible crimes in one indictment, the State must elect which charge on which to proceed." Moreover, he contends that

the trial court's failure to require election created the potential that each juror did not consider the 'same occurrence' in arriving at the verdicts. Some jurors may have considered only the incident where Kena Hodges physically abused the victim before she left for work, and convicted the defendant under a criminal responsibility theory. Other jurors may have considered only the defendant's alleged conduct in abusing the victim after Kena Hodges left for work.

We disagree that election was required in this case. Proof of multiple occurrences of the offense, any of which the State offers to satisfy the requirements of the indicted offense, is the typical situation in which election is crucial to a defendant's constitutional right to a unanimous jury. See, e.g., State v. Shelton, 851 S.W.2d 134 (Tenn. 1993); Burlison v. State, 501 S.W.2d 801 (Tenn. 1973); State v. Hoyt, 928 S.W.2d 935 (Tenn. Crim. App. 1995). In those situations, such as when a child alleges some type of abuse yet cannot relate when the offenses occurred, the jury must support a verdict of guilt by a unanimous decision that the defendant committed one specific offense—one juror may not convict based upon a decision that the defendant committed the offense on one date, while another juror believes the defendant committed the same statutory offense, but on different date. Such a defendant would be convicted of different offenses, each by a partial jury.

Here, in contrast, Defendant could only have been convicted of the same offense: a killing committed in perpetration of or attempt to perpetrate aggravated child abuse on December 28, 1995. Although the State did indeed present the jury two distinct alternatives, in doing so it posed no threat to Defendant's constitutional rights, because it offered not two alternative offenses, but two

alternative means for culpability for a single offense. Specifically, if several jurors believed Defendant inflicted blows to the victim, and several jurors believed that Defendant neglected the victim following blows by Kena, then we believe they may all convict of first degree murder committed during the perpetration of or attempt to perpetrate aggravated child abuse.

Similarly, the State need not elect between prosecution as a principal actor and prosecution for criminal responsibility in this case. See State v. Williams, 920 S.W.2d 247 (Tenn. Crim. App. 1995). In Williams, this Court found no error in the trial court's failure to require election between theories of actual perpetration of aggravated rape and criminal responsibility for the conduct of another. Id. at 257-58. We stated,

> Unlike the cited authority, this case involves one particular offense occurring during one criminal event. Problems with a unanimous jury verdict generally arise when the State fails to elect among different offenses. Here the State properly elected to seek a conviction of aggravated rape by serious bodily injury. The trial judge instructed the jury on the elements of this offense, and found the evidence to warrant a further instruction on criminal responsibility for another, and for criminal responsibility relative to the elements of aggravated rape. The jury reached a verdict based on one set of facts relating to the one incident of rape. We conclude that the Defendant's constitutional right to a unanimous jury verdict was not violated by the court's instructions.

Id.

Furthermore, if upon further review it is determined that failure to require election was error, we conclude that such error was harmless beyond a reasonable doubt. The jurors necessarily must have agreed upon the facts

underlying the conviction. That is to say, those jurors, if any, who convicted Defendant because they believed he inflicted blows upon Miyoshi, must necessarily have come to the conclusion that he then, for the remainder of the day, neglected her in such a manner as to adversely affect her health or safety. One cannot reach the former conclusion without subsequently reaching the latter conclusion—to do so would be totally inconsistent with the proof presented by the State. Likewise, those same jurors would have essentially concluded that Defendant breached his custodial duty to protect the child with the intent to promote commission of the aggravated child abuse initiated by Kena earlier in the morning, satisfying the offense of criminal responsibility for her conduct. This issue lacks merit.

### III. MOTION TO SUPPRESS

Next, Defendant argues that the trial court erred in denying his motion to suppress a statement taken by Detective E.J. Bernard of the Metropolitan Davidson County Police Department. In essence, Defendant claims that this statement should have been excluded from trial based upon its inherent unreliability. To demonstrate its unreliability, Defendant argues (1) that the statement was neither audiotaped nor videotaped, although both methods of recordation were available; and (2) that the most prejudicial of assertions found in Detective Bernard's typewritten account of Defendant's statement cannot be found in Bernard's contemporaneous, handwritten notes.

Relying on his typewritten report of Defendant's statement, Detective Bernard testified to Defendant's account of the events surrounding the victim's death. Specifically, he included:

> [Defendant] stated the child was placed in the bed and she was crying, for whatever the reasons may be. He further stated that he put some covers over her face, turned the radio up loud so that he wouldn't have to listen to the cries. That the child died at approximately noon that day, and the mother didn't come home 'till approximately 5 o'clock. . . . And he stated that . . . then they came up with a story about calling 911.

Defendant denied ever making these statements and argues that "any of these statements, had they actually been made by him, were of such importance that any trained police investigator taking contemporaneous notes would have included this information therein." He remarks that the statements cannot be corroborated by any other statement made by Defendant, by a recording of the statement made to Bernard, or by Bernard's handwritten notes.

Defendant urges this Court to require, as a condition to admissibility, recordation of a custodial interrogation when it is feasible. He notes that both Minnesota and Texas require custodial interrogations to be recorded, as do the Uniform Rules of Criminal Procedure and the Model Code of Pre-Arraignment Procedure. We decline to adopt this rather bright-line rule of admissibility, reserving this issue for our supreme court or the legislature. In addition, we conclude that the State was not required to record this particular interrogation as a prerequisite to its admissibility.

Here, Defendant had an opportunity to cross-examine Detective Bernard regarding discrepancies between Bernard's testimony at trial, based upon his typewritten statement, and his handwritten notes. Defendant did indeed cross-examine on such discrepancies, as well as the feasibility of recording the interrogation. Detective Bernard testified that the typed statement was produced from the notes within twenty-fours hours, that he accurately transcribed the statement, and that no recording devices were available in the particular room in which the statement was taken.

Defendant does not dispute that he gave the statement knowingly and voluntarily; he disputes the accuracy of Detective Bernard's recollection. We consider this an issue of credibility appropriate for the jury. Through cross-examination, the jury heard evidence that the typed statement contained statements not recorded in the detective's notes, and the jury apparently accredited Detective Bernard's testimony. This issue is without merit.

## IV. EVIDENCE OF PRIOR ABUSE BY KENA HODGES

In his fourth issue, Defendant argues that the trial court erred by refusing to permit Defendant to present evidence through the testimony of two witnesses that Kena Hodges, the victim's mother, had abused the child in the past. The State argues, and the trial court agreed, that Tennessee Rule of Evidence 404(b) mandates the inadmissibility of this evidence. In response, Defendant cites State v. Smith, 868 S.W.2d 561, 574 (Tenn. 1993), State v. Turnbill, 640 S.W.2d 40, 46-47 (Tenn. Crim. App. 1982), and State v. Glebock, 616 S.W.2d 897, 905-06

(Tenn. Crim. App. 1981), for the proposition that evidence of prior acts of violence against the victim are relevant to show motive and intent to commit the offense.

Tennessee Rule of Evidence 404(b) reads:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
 (1) The court upon request must hold a hearing outside the jury's presence;
 (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and
 (3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

The State correctly notes that, once the above criteria of Rule 404(b) have been satisfied, the appropriate standard of review is whether the trial court abused its discretion when ruling upon the admissibility of evidence at trial. State v. DuBose, 953 S.W.2d 649 (Tenn. 1997). The trial court followed the strictures of Rule 404(b) by conducting a hearing out of the presence of the jury; by ruling on the record that the evidence was being offered to show the propensity of Kena Hodges to commit abuse, rather than for any other purpose; and by indicating that the evidence was cumulative—that the record already reflected other similar evidence. The trial court, therefore, must be afforded an abuse of discretion standard of review.

State v. Smith, relying upon Turnbill and Glebock, held that "violent acts indicating the relationship between the victim of a violent crime and the defendant prior to the commission of the offense are relevant to show defendant's hostility toward the victim, malice, intent, and a settled purpose to harm the victim." 868 S.W.2d at 574. Here, we have a distinguishable case: the State does not seek to introduce evidence against the accused; rather, Defendant seeks to introduce evidence that another person, Kena Hodges, committed a prior violent act against the victim.

Examining Rule 404(b) in conjunction with Rule 401, this evidence may or may not be relevant evidence in this case—that is to say, it may or may not have "any tendency to make the existence of any fact that is of consequence to the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Assuming that under Rule 404(b), prior violent acts against the victim can be relevant evidence of motive and intent to commit the acts again, evidence in this case that Kena had abused the child could be relevant evidence that she had abused Miyoshi on the day of her death, but it would not make abuse or neglect by Defendant any less likely. Therefore, we conclude that the trial judge did not abuse his discretion by denying admission of this evidence.

## V. JURY INSTRUCTION ON CRIMINAL RESPONSIBILITY

Defendant next contends that the trial court committed an error of constitutional magnitude when it instructed the jury on the third section of criminal responsibility for the conduct of another and a juvenile criminal statute mandating

that persons who have knowledge of child abuse report such abuse to the authorities.  See Tenn. Code Ann. §§ 39-11-402(3), 37-1-403.  Specifically, the trial court instructed:

> The defendant is criminally responsible for an offense committed by the conduct of another if having a duty imposed by law or voluntarily undertaken to prevent commission of the offense and acting with the intent to benefit in the proceeds or results of the offense or to promote or assist its commission, the defendant fails to make a reasonable effort to prevent commission of the offense.

In a later instruction, separated by nineteen pages of the record, the trial court advised the jury,

> Any person having knowledge of or called upon to render aid to any child who is suffering from or has sustained any wound, injury, disability or physical or mental condition which is of such a nature as to reasonably indicate that it has been caused by brutality, abuse or neglect or which on the basis of available information reasonably appears to have been caused by brutality, abuse or neglect shall report such harm immediately by telephone or otherwise to the judge having juvenile jurisdiction or to the county office of the Department of Human Services or to the office of the Sheriff or the chief law enforcement official of the municipality where the child resides.  Persons includes, but is not limited to neighbor, relative, friend or any other person.

We conclude that, while the latter instruction was likely not warranted by the facts of this case, its inclusion was not erroneous; and furthermore, if erroneous, such error was harmless beyond a reasonable doubt.

We find that these instructions were charged to the jury each separate from the other, with no indication from the trial court that the jury should consider them together and with no further instruction that the latter constituted a "duty imposed by law" under the former.  Had the jury decided that Defendant failed to report child abuse in violation of this instruction, such a decision nevertheless should

have had no bearing on fulfillment of the criminal responsibility statute, because the third criminal responsibility prong requires "a duty imposed by law . . . to prevent commission of the offense." Tenn. Code Ann. § 39-11-402(3) (emphasis added). Failing to report child abuse, by its terms, is an altogether different proposition and does not satisfy this prong of criminal responsibility. The two instructions combined created no error. Therefore, we now contemplate whether the instructions given alone created error.

"It is the duty of the trial court to give a complete charge of the law applicable to the facts of a case." State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986) (citing State v. Thompson, 519 S.W.2d 789, 792 (Tenn. 1975)); see State v. Burkley, 804 S.W.2d 458, 461 (Tenn. Crim. App. 1990). In this case, the State presented a theory by which the jury could conclude that Defendant was criminally responsible for Kena Hodges's actions. We have determined that the evidence was sufficient to find Defendant guilty of criminal responsibility for felony murder by reason of Defendant undertaking the obligation to care for and protect a young, helpless child. Therefore, we find that the trial court was warranted in charging the jury with the third prong of criminal responsibility—having a duty imposed by law.

The second instruction, dealing with failure to report child abuse, we find to be essentially irrelevant. Defendant was not charged under the juvenile code with failure to report child abuse, nor does this instruction assist the trier of fact in determining any issue relevant to a charged offense. Our supreme court

addressed irrelevant jury instructions in Adcock v. State, 236 S.W.2d 88 (Tenn.

1949), and Pedigo v. State, 236 S.W.2d 89 (Tenn. 1951), in which improper jury

instructions required reversal of convictions. We find both cases distinguishable

from the case at bar.

In Pedigo, the supreme court described the jury instruction as follows:

> A photostat of the charge as it was handed to the jury, convinces us that by reason of incompetent and irrelevant matter, illegible interlineation and meaningless annotation, the charge might as well have been written in a foreign language and could serve no purpose except to confuse the jury.

236 S.W.2d at 90. Here, we have only a single irrelevant instruction, no illegible

interlineation and no meaningless annotation. This case clearly does not rise to

the magnitude of the impropriety in Pedigo. Turning to Adcock, the predecessor

to Pedigo and the case of Pedigo's co-defendant, we find that the written

instructions given to the jury "contained not only points of law applicable to the

. . . case, but also much that was inapplicable and confusing." Furthermore,

> [n]ot only did [the Adcock jury] receive much law that had no application to the facts of this case, but they were also given instruction on many facts which were not in evidence and were contrary to the theory of the Defendant.
>
> The defense of the accused was an alibi. In the charge taken by the jury to the jury room, it was stated . . . , "the Defendant admits that he did the killing, but says that it was done by him in his own necessary self-defense, etc." Then follows an elaborate charge on self-defense.

236 S.W.2d at 89.

Again, we conclude that the case at bar clearly does not reach the significance of <u>Adcock</u>. We find no reversible error in the trial court's inclusion of this accurate and non-misleading, yet irrelevant instruction.


## VI. STATUTORY AGGRAVATING FACTORS

### A. Tennessee Code Annotated § 39-13-204(i)(1)

Defendant argues that the trial court erred by instructing the jury on both statutory aggravating factors requested by the State during sentencing. The first factor, listed in Tennessee Code Annotated § 39-13-204(i)(1), reads: "The murder was committed against a person less than twelve (12) years of age and the defendant was eighteen (18) years of age, or older." Tenn. Code Ann. § 39-13-204(i)(1).

In support of his argument, Defendant contends that this factor "should not apply to cases of felony murder where the underlying felony is aggravated child abuse, because such application would automatically support a sentence of life without parole for any defendant over the age of eighteen." Moreover, Defendant claims,

> Application of this factor in no meaningful way narrows the class of defendants eligible for a sentence of life without parole. This aggravating factor unconstitutionally duplicates a single aspect of the alleged crime - the victim's age - and thereby violates due process, double jeopardy, the right to a fair trial, and the protections against cruel and unusual punishment as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution; and Article I, §§ 8, 9, 16, and 17 of the Tennessee Constitution.

This issue has been resolved by our supreme court in State v. Butler, No. 02S01-9711-CR-00094, 1998 WL 710632 (Tenn., Jackson, Oct. 12, 1998) (for publication). In Butler, the supreme court held that "there are no constitutional or statutory prohibitions" to relying upon the felony murder aggravating circumstance when seeking a sentence of life without the possibility of parole for defendants charged with felony murder. Id. at 2 (discussing Tennessee Code Annotated § 39-13-204(i)(7)).

The court first stated that, when the proposed penalty is not death, constitutional provisions prohibiting cruel and unusual punishment and defining the need to narrow the class of offenders "are not at issue." Id. at 4-5. Second, the court discussed statutory sentencing requirements—specifically, §§ 39-13-204 and 39-13-207—and determined that "[n]othing in the text of either section 39-13-207 or 39-13-204 prohibits the jury from considering an aggravating circumstance when the aggravator duplicates an element of the underlying offense." Id. at 7.

Although in this case the trial court instructed as an aggravator a different element of the underlying offense, we are confronted with a nearly identical situation. Furthermore, prior to Butler, this Court approved the use of the same aggravator in a case in which age was an element of the offense. State v. Danny Ray Lacy, No. 02C01-9701-CC-00013, 1997 WL 729261 (Tenn. Crim. App., Jackson, Nov. 25, 1997) (permitting § 39-13-204(i)(1) as an aggravating factor in a prosecution for first degree murder by aggravated child abuse), perm. to

appeal denied (Tenn. 1998). We therefore hold that there are no constitutional or statutory impediments to the use of § 39-13-204(i)(1) as a sentencing aggravating factor by the trial court in this case.

*B. Tennessee Code Annotated § 39-13-205(i)(5)*

Defendant next argues that the evidence was insufficient for the jury to find the statutory aggravating factor in Tennessee Code Annotated § 39-13-204(i)(5)—that the murder was "especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." The State contends that it presented sufficient evidence by which the jury could have come to this conclusion beyond a reasonable doubt, and we agree.

"Torture" has been defined as "the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious." State v. Williams, 690 S.W.2d 517, 529 (Tenn. 1985); State v. Nesbit, 1998 WL 670966, at *10 (Tenn., Jackson, Sept. 28 1998). In State v. Pike, 1998 WL 690064 (Tenn., Knoxville, Oct. 5, 1998), the supreme court noted that "[w]ith respect to 'serious physical abuse beyond that necessary to produce death,' we explained in State v. Odom that 'serious' alludes to a matter of degree, and that the physical abuse must be 'beyond that' or more than what is 'necessary to produce death.'" 1998 WL 690064, at *14. When determining whether the evidence shows "severe physical or mental pain,"

> [t]he jury may use their common knowledge and experience in deciding whether a fact is logically deducible from the circumstances in evidence, or in making reasonable inferences from

the evidence, and may test the truth and weight of the evidence by their own general knowledge and judgment derived from experience, observation, and reflection; but neither jurors nor judges when acting as arbiters of guilt are permitted to base their decisions on the existence or non-existence of facts according to their personal beliefs or experiences, but only on facts established by legal and competent evidence or on inferences deducible from such proven facts as are authorized by law.

Fairbanks v. State, 508 S.W.2d 67, 69 (Tenn. 1974) (citing 23A C.J.S. Criminal Law § 1373), quoted in Nesbit, 1998 WL 670966, at *11.

According to the proof in the record, Miyoshi Richardson conclusively sustained blunt force trauma to the head and torso, each injury being sufficient to cause death, as a result of multiple blows causing various hemorrhaging of the brain and lacerations to the liver. In addition to these grievous injuries, the victim showed affirmative evidence of shaken baby syndrome by her damaged, hemorrhaging optic nerve area. Finally, in addition to her serious physical injuries, the jury heard evidence that the child suffered both physical torture—through an explanation of the child's worsening symptoms throughout the day of her death prior to slipping into unconsciousness, due to deprivation of medical attention; as well as mental torture—through a detailed description of how the two-year-old child was forced to stand with her palms against the wall, in a corner of the room all night long, while her mother and Defendant engaged in sexual intercourse and slept, without being permitted to sleep, sit down, or relieve herself. We find the evidence sufficient to permit a jury to find this aggravating factor.

## VII. MAXIMUM SENTENCE FOR AGGRAVATED CHILD ABUSE

Defendant's final argument is that the trial court erred by imposing the maximum sentence available by law for the conviction of aggravated child abuse—twenty-five years as a Range I offender. He contends that the trial court applied one enhancement factor in error, while also improperly denying one mitigating factor. Although this Court must conduct a de novo review when a criminal defendant appeals the length, range, or manner of service of sentence; the legislature has mandated a "presumption that the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d). The presumption of correctness is conditioned, however, upon proper consideration by the trial court of the sentencing principles in Tennessee Code Annotated § 40-35-103. State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). We find no error by the trial court in this case.

### *Tennessee Code Annotated § 40-35-114(5)*

The trial court applied the statutory enhancement factor found in Tennessee Code Annotated § 40-35-114(5): "The defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense." Tenn. Code Ann. § 40-35-114(5). Defendant asserts that this enhancement factor was improperly considered because it is inherent to the crime—an "essential element" of the offense. Defendant cites this Court's opinion in State v. Claybrooks, 910 S.W.2d 868, 872 (Tenn. Crim. App. 1994), for the proposition that "[f]actors that are inherent in a particular offense, even if not designated as an element, may not be applied to increase a sentence."

Specifically, he argues that it is impossible to inflict serious bodily injury upon a child of six years or less—elements of the offense—without treating the child with "exceptional cruelty."

The State, in support of its argument that this enhancement factor was appropriately applied, cites State v. Poole, 945 S.W.2d 93 (Tenn. 1997), in which our supreme court held that the element of "serious bodily injury," as included in the offense especially aggravated robbery, does not necessarily constitute "exceptional cruelty." Id. at 98. The court stated, "In other words, the facts in a case may support a finding of 'exceptional cruelty' that 'demonstrates a culpability distinct from and appreciably greater than that incident to' the crime of especially aggravated robbery." Id. We believe that Poole provides appropriate guidance in this case. Defendant in this case could be convicted of aggravated child abuse without a finding of exceptional cruelty and, for that reason, application of the enhancement factor was permissible in this case.

*B. Tennessee Code Annotated § 40-35-113(4)*

Defendant's final argument is that the trial court should have applied the statutory mitigating factor found in Tennessee Code Annotated § 40-35-113(4): "The defendant played a minor role in the commission of the offense." The trial court was within its authority to reject this mitigating factor in light of the evidence presented. Even if the evidence showed that Kena Hodges inflicted the blunt force trauma upon the victim, Defendant at the very least ignored the obvious, severe medical peril of a helpless, two-year-old child for whom he had accepted

a primary care responsibility on a regular basis and for whom he had accepted a parental relationship. Taken even in the light most favorable to Defendant, the evidence does not portray a minor role for him.

*C. Maximum Sentence*

Under Tennessee Code Annotated § 40-35-210, the trial court shall presumptively apply the mid-point of the sentencing range for Class A felonies. Tenn. Code Ann. § 40-35-210(c). Here, the mid-point of the range is twenty years because Defendant is a Range I offender. When enhancement factors are found but no mitigating factors are found, the trial court may sentence a defendant above this presumptive sentence.[7] Because the trial court found two statutory enhancement factors, we conclude that the trial court did not err in sentencing Defendant to twenty-five years on the charge of aggravated child abuse.

In conclusion, we affirm the judgment of conviction for first degree murder committed during perpetration of aggravated child abuse and the conviction for aggravated child abuse. Furthermore, we affirm Defendant's sentences of life imprisonment without the possibility of parole for murder and twenty-five years for aggravated child abuse.

---

[7] Despite the fact that a plain-language reading of § 40-35-210 would indicate that a sentencing court must return to the minimum sentence in the range when enhancement factors are present (although the presumptive sentence with <u>no</u> mitigating or enhancement factors is the mid-point), the appropriate and correct result is to start from the mid-point of the range. <u>See</u> <u>State v. Katherine Irene Warren</u>, No. 01C01-9710-CC-00455, 1998 WL 749412, at *4 (Tenn. Crim. App., Nashville, Oct. 28, 1998) (following <u>State v. Chance</u>, 952 S.W.2d 848 (Tenn. Crim. App. 1997), which noted the incongruity of § 40-35-210(c), (d), and (e), but concluded that a plain-language reading of its provisions would create an absurd result).

_____
DAVID H. WELLES, JUDGE

CONCUR:

_____
JERRY L. SMITH, JUDGE

_____
JOHN K. BYERS, SENIOR JUDGE