IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 5, 2004

## STATE OF TENNESSEE v. BERNARD J. HENRY

**Appeal from the Criminal Court for Shelby County**
**No. 02-05634     Arthur T. Bennett, Judge**

———————————

**No. W2003-03045-CCA-R3-CD  - Filed December 9, 2004**

———————————

A Shelby County Criminal Court jury convicted the defendant, Bernard J. Henry, of two counts of aggravated child abuse and neglect, a Class A felony, and the trial court sentenced him as a Range I, violent offender to concurrent sentences of twenty-five years.  The defendant appeals, claiming that the evidence is insufficient to support the convictions and that the trial court misapplied enhancement factors.  We conclude that the evidence is sufficient but that the trial court improperly enhanced the defendant's sentences.  We reduce the defendant's sentences to twenty years for each conviction and remand the case for the entry of appropriate judgments of conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part,**
**Modified in Part, Case Remanded**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., J., joined.  DAVID G. HAYES, J., filed a concurring opinion.

Robert Wilson Jones, District Public Defender; Tony N. Brayton, Assistant Public Defender (on appeal); Bill Robilio and Robert C. Felkner, Assistant Public Defenders (at trial), for the appellant, Bernard J. Henry.

Paul G. Summers, Attorney General and Reporter; Michelle Chapman McIntire, Assistant Attorney General; William L. Gibbons, District Attorney General; and Scot A. Bearup, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to the defendant's whipping his two-year-old daughter.  Delius Henry, the defendant's ex-wife and the victim's mother, testified that the victim was born in Georgia on November 22, 1999, and that she and the defendant separated in August 2000.  She said that the defendant moved to Memphis but that the victim lived with the defendant from January to April 2001 and from January to April 2002.  She said that before the victim went to live with the defendant in 2002, the victim had only a small scar on her left hand and had no marks or scars anywhere else

on her body. She said that in April 2002, she received a telephone call from the defendant, who told her that two police officers had come to his apartment because "one of his neighbors had called the police on him." She said that according to the defendant, the officers had taken the victim away. She said that as a result of the defendant's call, she telephoned Johnny Toy from the Department of Children's Services and that Mr. Toy told her about what had happened to the victim. She said she flew to Memphis and went to Le Bonheur Children's Medical Center to see the victim. She said that the victim's lip was bandaged, that the victim had scars all over her body, and that the victim could not walk. She said that she stayed with the victim for two and one-half days and that the victim was released from the hospital and into the care of a foster parent. She said that scars on the victim's right leg caused the victim to limp and that the victim had to have physical therapy. She said the victim was returned to her on June 7, 2002, and had to have three surgeries. She said that the victim had two scars on her face and several on her legs and that doctors injected steroids into the scars on the victim's face twice in an attempt to flatten them.

On cross-examination, Ms. Henry testified that when the victim stayed with the defendant for several months in 2001, she telephoned the defendant to check on the victim. She said that when the victim returned to her in 2001, the victim had no problems and had been treated very well. She acknowledged that the defendant was a good father.

Officer Christopher Price of the Memphis Police Department testified that he and another officer were dispatched to the defendant's apartment on April 18, 2002, in order to check on the well-being of a two-year-old child. He said that when they arrived, they knocked on the door and the defendant let them into the apartment. He said that a woman also was in the apartment and that the victim was sitting on the living room floor. He said that he saw a sore on the victim's lip and that the woman told him the victim had hurt her lip and had been picking it. He said that he began looking at the victim further, that he noticed the victim had a cut on the bridge of her nose, and that the defendant and the woman could not explain how the victim got the cut. He said he lifted the victim's shirt, saw marks on her back, and called his lieutenant to the scene. He said that when the lieutenant arrived, they pulled down the victim's pants and saw marks on her legs and a large bandage on the back of her right leg. He said they took off the bandage and saw a large sore behind the victim's knee. He said that the victim would not put any weight on her right leg and that the victim also had a round, skinless sore on her buttock. He said the defendant and the woman explained that they had whipped the victim because she was urinating on herself. He said that he took the victim into protective custody and that another officer transported the victim to Le Bonheur Children's Medical Center. On cross-examination, Officer Price testified that the defendant was very cooperative.

Officer Diana Dickerson of the Memphis Police Department testified that she was called to the precinct to pick up the victim and that she took the victim to the hospital. She said the victim was afraid and quiet. She said that when she tried to pick up the victim, the victim moaned like she was in pain. She said the victim would not let one side of her body touch the hospital bed.

Sergeant Terry Pirtle of the Memphis Police Department's Sex Crime Child Abuse Squad testified that he investigated the case and asked the defendant to come to his office for an interview, which the defendant and the defendant's girlfriend, Tammy Thompson, did the next day. He said that he and the defendant went into an interview room, that he read the defendant his rights, and that the defendant told him the following: The victim's mother had custody of the victim, but the victim had been living with the defendant since January 2002. When the victim came to live with him in January, the victim did not have any scars or bruises. The defendant had been disciplining the victim because the victim was urinating on herself. The defendant used a switch and a belt to whip the victim, and the defendant disciplined the victim most of the time. However, Ms. Thompson also disciplined the victim. The defendant loved the victim and was not trying to hurt her. The defendant told Sergeant Pirtle that he had last whipped the victim about two weeks before the police took her away from him. On cross-examination, Sergeant Pirtle acknowledged that the defendant was cooperative and that he arrested the defendant and Ms. Thompson.

Dr. Karen Lakin, who treated the victim at Le Bonheur Children's Medical Center, testified that the victim had many soft tissue injuries to her skin, including lacerations and bruises. She said that skin was missing from some of the injured areas and that she had difficulty telling whether those injuries were lacerations or burns. She said that the victim had a serious, deep infection on the back of her right leg and an infected wound on her upper lip. She said that the infections resulted from injuries to the skin, that it would have taken one to five days for the injuries to become infected, and that both infected wounds would have been painful. She said that the victim could not fully extend her right knee, indicating that the wound behind the knee had been "going on for a little while," and that the victim would not put any weight on the knee. She said that by the time the victim was discharged from the hospital on April 24, the victim still walked with a slight limp. Regarding the wound on the victim's upper lip, she stated that excessive scar tissue formed between the victim's nose and upper lip, that there was no "sure fire way" to remove the scar tissue, and that it was possible the victim would have the scars for the rest of her life.

Dr. Lakin testified that the victim had loop-shaped marks on her legs, indicating that the victim had been hit with a looped cord, and that the marks on the victim were in various stages of healing. She said that the victim had an injury on one of her buttocks and that "we had difficulty trying to figure out whether it was actually a burn or just where a chunk of flesh had come off." She said the victim was very malnourished but gained six pounds while in the hospital. She said that the victim received morphine, a heavy painkiller, and that doctors usually did not give morphine to children. She said that when the victim was discharged from the hospital, the victim was still taking antibiotics and that the victim had to receive physical therapy.

On cross-examination, Dr. Lakin acknowledged that it was not unusual for children to develop infections and that the victim's using dirty hands to pick at a wound could cause the wound to become infected. She also acknowledged that the victim could have been naturally small and underweight for her age and that the victim's open sores could have been caused by untreated impetigo or untreated joint infections. On recross-examination, though, Dr. Lakin testified that in her opinion, the victim's open wounds were not caused by ringworm or impetigo.

The defendant testified that the victim was in his custody from January to April 2001 and from January to April 2002 because the victim's mother was tired of her. He said that during that time, he clothed and fed the victim. He said the victim lived with him on weekends but lived with his girlfriend, Tammy Thompson, during the week because he was working. He said that from April 15 to April 18, 2002, the victim lived with Ms. Thompson and that Ms. Thompson brought the victim to his apartment about 10:30 p.m. on April 18. He said that he noticed a mark under the victim's nose and that the victim was limping. He said that he asked Ms. Thompson what had happened to the victim and that Ms. Thompson told him she had spanked the victim. He said Ms. Thompson told him that the victim had been picking at marks on the victim's leg and face, making sores. He said he put a bandage on the victim's leg and Neosporin on the victim's lip and heard a knock at the door. He said that the police were there and that he let the officers into his apartment. He said that when the officers pulled down the victim's pants, he saw for the first time the sores on the victim's right leg and buttock. He said that the officers took the victim to the hospital and that he tried to see the victim three times but was turned away. He said that Sergeant Pirtle telephoned him on April 22 and that he met with Sergeant Pirtle the next day. He said that during his interview, he admitted the victim received the injuries while she was in his custody. He said, though, that he never admitted causing the injuries. He acknowledged that he had used a switch and a belt to discipline the victim for urinating on herself but said that he never left marks on the victim. He said that Ms. Thompson also had used belts to whip the victim and that the first time he saw the victim's injuries was on April 18.

On cross-examination, the defendant acknowledged that the victim lived with Ms. Thompson during the week even though he was home about twelve hours per day. He said that the first time he saw marks on the victim's back was about three weeks before the police took her away from him. He said Ms. Thompson told him that the marks on the victim's back had resulted from Ms. Thompson's niece scratching the victim. He acknowledged that the victim repeatedly returned from Ms. Thompson's care with scratches and bruises. He denied hitting the victim with a cord and said that he only disciplined her with a switch. Although the defendant had testified on direct examination that he had never left marks on the victim, he testified on cross-examination that he had left marks on the victim's calves. The jury convicted him of two counts of aggravated child abuse and neglect.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is insufficient to support his aggravated child abuse and neglect convictions because the evidence shows that the victim had been in the care of Tammy Thompson immediately before the police took the victim into protective custody and because he treated the victim's wounds. The state claims that the evidence is sufficient. We agree with the state.

Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable

doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

The defendant was indicted for two counts of aggravated child abuse and neglect, which is one crime that can be satisfied by two different courses of conduct, serious bodily injury caused by physical abuse or serious bodily injury caused by neglect. See T.C.A. § 39-15-402(a); State v. Hodges, 7 S.W.3d 609, 622 (Tenn. Crim. App. 1998) (providing that T.C.A. § 39-15-401, the child abuse and neglect statute, creates only one crime). "Serious bodily injury" is bodily injury involving "(A) A substantial risk of death; (B) Protracted unconsciousness; (C) Extreme physical pain; (D) Protracted or obvious disfigurement; or (E) Protracted loss or substantial impairment of a function of a bodily member, organ, or mental faculty." T.C.A. § 39-11-106(a)(34).

Taken in the light most favorable to the state, the evidence is sufficient to support the convictions. The defendant and his ex-wife testified that before the victim went to live with him in January 2002, the victim had no marks or injuries on her body. Dr. Lakin testified that the victim had large, open wounds on her face, right leg, and buttock and that it would have taken one to five days for the wounds to become infected. She said that marks on the victim indicated the victim had been hit with a looped cord and that the marks were in various stages of healing. She also said that the victim received a powerful medication for her pain and that excessive scar tissue resulted from the wound on the victim's face. We note that photographs taken near the time of the trial and introduced into evidence show large scars between the victim's nose and upper lip. The defendant admitted whipping the victim with a switch and belt. We believe a rational jury could have concluded beyond a reasonable doubt that the defendant physically abused the victim, causing extremely painful lacerations to her skin, and that he neglected to seek proper medical treatment for her wounds, which resulted in the wounds becoming infected and disfiguring the victim. The evidence is sufficient to support the convictions.

## II. SENTENCES

The defendant claims that his sentences are excessive because the trial court improperly applied two enhancement factors. The state notes that the recent case of Blakely v. Washington, 542 U.S. ___, 124 S. Ct. 2531 (2004), calls into question a trial court's ability to enhance a defendant's sentence above the presumptive sentence for any enhancement factor other than for a defendant's prior convictions. However, the state contends that the defendant has waived any Blakely issue because Blakely does not establish a new rule in Tennessee. See Schriro v. Summerlin, ___ U.S. ___, ___, 124 S. Ct. 2519, 2522 (2004) (stating that "[w]hen a decision of this Court results in a 'new rule,' that rule applies to all criminal cases still pending on direct review"). The state also claims that, in any event, any misapplication of enhancement factors under Blakely is harmless error because the evidence establishing those factors is uncontroverted and overwhelming. We hold that

the trial court improperly applied enhancement factors under <u>Blakely</u> and reduce the defendant's sentences accordingly.

The trial court applied the following enhancement factors as provided in T.C.A. § 40-35-114: (3) that the defendant was a "leader in the commission of an offense involving two (2) or more criminal actors," (5) that the victim was particularly vulnerable because of her age, (6) that the defendant treated the victim with exceptional cruelty during the commission of the offenses, (7) that the personal injuries inflicted on the victim were particularly great, and (16) that the defendant abused a position of private trust. The trial court noted that the defendant had no prior convictions but held that he should serve the maximum punishment in the range for a Class A felony, twenty-five years, for each conviction.

Appellate review of sentencing is <u>de novo</u> on the record with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d). As the Sentencing Commission Comments to this section note, the burden is now on the appealing party to show that the sentencing is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. <u>State v. Fletcher</u>, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." <u>State v. Ashby</u>, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. T.C.A. § 40-35-210(f) (1990).

<u>State v. Jones</u>, 883 S.W.2d 597, 599 (Tenn. 1994).

Also, in conducting a <u>de novo</u> review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, and (7) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210; <u>see</u> <u>Ashby</u>, 823 S.W.2d at 168; <u>State v. Moss</u>, 727 S.W.2d 229, 236-37 (Tenn. 1986).

The range of punishment for a Range I offender is fifteen to twenty-five years for a Class A felony. T.C.A. § 40-35-112(a)(1). Unless there are enhancement factors present, the presumptive sentence to be imposed is the midpoint in the range. T.C.A. § 40-35-210(c). Our sentencing act provides that procedurally, the trial court is to increase the sentence within the range based upon the existence of enhancement factors and, then, reduce the sentence as appropriate for any mitigating factors. T.C.A. § 40-35-210(d), (e). The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record. T.C.A. § 40-35-210, Sentencing Commission Comments; Moss, 727 S.W.2d at 237; see Ashby, 823 S.W.2d at 169.

We conclude that Blakely affects the portion of our 1989 Sentencing Act that allows judges to find applicable certain enhancement factors by a preponderance of the evidence and use those factors to increase a defendant's sentence above the presumptive sentence in the range. This court has concluded that Blakely essentially establishes a new rule in Tennessee and specifies that other than prior convictions, any facts not reflected in the jury's verdict and used to increase a defendant's punishment above the presumptive sentence must be found by the jury, not the trial court, beyond a reasonable doubt. See State v. Chester Wayne Walters, No. M2003-03019-CCA-R3-CD, White County, slip op. at 19-21 (Tenn. Crim. App. Nov. 30, 2004).

Judge Hayes concurs in our results but writes separately to express his view that the defendant waived any Blakely related issues by failing to present them in the trial court. See State v. Carlos Eddings, No. W2003-02255-CCA-R3-CD, Shelby County, slip op. at 2-3 (Tenn. Crim. App. Oct. 8, 2004) (Hayes, J., concurring and dissenting). Regarding waiver, this court in Walters noted that our supreme court had expressly held in Graham v. State, 90 S.W.3d 687, 692 (Tenn. 2002), that Tennessee's sentencing procedures complied with Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348 (2000), and stated,

> we have a difficult time faulting a defendant in Tennessee for not raising the issue before Blakely. We conclude that Blakely alters Tennessee courts' interpretation of the phrase "statutory maximum" and establishes a new rule in this state. The defendant's raising the issue while his direct appeal was still pending is proper.

Walters, slip op. at 21.

In the present case, we note that T.C.A. § 40-35-114 prohibits using enhancement factors that are elements of the offense and that our supreme court has held that "proof of serious bodily injury will always constitute proof of particularly great injury." Jones, 883 S.W.2d at 602. Therefore, the trial court improperly applied enhancement factor (7). The trial court also improperly applied the remaining factors under Blakely because the facts supporting their application were neither admitted by the defendant nor found by a jury beyond a reasonable doubt. While this court held in Walters that Blakely errors are subject to harmless error analysis, we conclude that harmless error review would not affect the disposition of this case.

When we determine that the trial court committed error in sentencing a defendant, we review the defendant's sentence de novo with no presumption of correctness. See State v. Poole, 945 S.W.2d 93, 96 (Tenn. 1997). Upon de novo review, however, "we cannot violate Blakely in our determination of appropriate enhancement factors." Walters, slip op. at 26. Because we have determined that the trial court improperly applied factor (7), we must review the defendant's sentences de novo.

Given that the defendant has no prior convictions, we conclude that any reapplication of the enhancement factors found by the trial court would violate the rule announced in Blakely. The defendant's sentences must be reduced to twenty years, the presumptive sentence in the range for a Class A felony. Based upon the foregoing and the record as a whole, we affirm the defendant's convictions but modify the sentences to twenty years and remand the case for entry of appropriate judgments of conviction.

_____
JOSEPH M. TIPTON, JUDGE