IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 18, 2002

## MICHAEL LYNN WALTON v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 93-C-1076      Seth Norman, Judge**

---

**No. M2002-00586-CCA-R3-PC - Filed March 14, 2003**

---

Petitioner, Michael Lynn Walton, appeals the trial court's denial of relief under his post-conviction petition. Petitioner alleged he received ineffective assistance of counsel at trial based on counsel's failure (1) to adequately advise Petitioner of the consequences of proceeding to trial; (2) to adequately cross-examine the victim; (3) to require the State to elect which offenses it was relying upon to support Petitioner's convictions; and (4) to appeal the State's failure to make an election. Based upon a thorough review of the record, we affirm the judgment of the post-conviction court denying Petitioner's claim for relief based on counsel's failure to adequately advise Petitioner about the potential consequences resulting from two rape convictions and failure to specifically address the victim's inconsistent statements at the second trial. However, we disagree with the post-conviction court's finding that counsel's failure to require an election of offenses was not deficient conduct and that Petitioner was not prejudiced by such conduct. Accordingly, the judgment is reversed, Petitioner is granted post-conviction relief, and the case is remanded to the trial court for retrial on the two counts of rape.

### Tenn. R. App. P. 3, Appeal as of Right;
### Judgment of the Criminal Court is Reversed and Remanded

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and ROBERT W. WEDEMEYER, JJ., joined.

David M. Hopkins, Nashville, Tennessee, for the appellant, Michael Lynn Walton.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Pamela Anderson, Assistant District Attorney General; and Kathy Morante, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

Petitioner was indicted for two counts of official misconduct, two counts of rape, one count of sexual battery and one of count attempted rape. Prior to the commencement of Petitioner's first trial, the attempted rape and sexual battery charges were dismissed and the trial proceeded on the two counts of rape and two counts of official misconduct.

At the conclusion of his first jury trial, Petitioner was found guilty of both counts of official misconduct, but the trial court declared a mistrial as to the rape counts when the jury was unable to reach a verdict. Petitioner was retried on the two counts of rape, and a jury found Petitioner guilty of both counts. After a sentencing hearing, Petitioner was sentenced to one year on each of the official misconduct convictions and eight years on one rape conviction and nine years on the other. The trial court ordered the sentences to run concurrently, for an effective sentence of nine years. The court also entered an amended judgment nunc pro tunc on the two rape counts, sentencing Petitioner as a multiple rapist under Tenn. Code Ann. § 39-13-523(a)(2). As a multiple rapist, Petitioner is required to serve 100% of his sentence.

In his direct appeal, Petitioner argued that (1) the evidence was insufficient to sustain his two convictions of rape; (2) the trial court erred in denying Petitioner's motion for an instruction as to statutory rape as a lesser included offense of rape; and (3) the trial court erred in denying Petitioner probation on the two counts of official misconduct. On November 12, 1997, this Court filed an opinion affirming the trial court's judgment. *State v. Walton*, No. 01C01-9509-CR-00290, 1997 WL 709479 (Tenn. Crim. App. 1997)*, appeal denied, not for citation* (Tenn. 2000).

## I. Factual Background

The State's proof at trial was as follows. In July, 1992, thirteen-year-old J.C. ran away from his home in Kentucky. (The minor victim will be referred to by his initials.) After stealing a car, J.C. drove south until the car broke down outside Nashville. He hitched a ride with a truck driver and later that afternoon ended up at Riverfront Park in downtown Nashville. J.C. had no money, no change of clothes and had not eaten since breakfast. Later that night, Petitioner, a member of the Metropolitan Nashville Police Department, drove past J.C. who was walking down the sidewalk. Petitioner slowed down, and J.C. waved. In a few minutes, Petitioner, now on foot, approached J.C. Although he was off duty, Petitioner still wore his police uniform. Petitioner asked J.C. if he was aware it was nearly time for curfew, and J.C. told Petitioner that he was waiting for someone to pick him up. Petitioner offered to take J.C. to get some food, and eventually J.C. got into Petitioner's car.

Petitioner stopped first at a MacDonald's close to Riverfront Park and bought J.C. a hamburger and soft drink. Petitioner then drove to Bellevue where he lived. At Petitioner's house, J.C. finished his meal and then asked Petitioner if he could take a shower. After he finished showering, Petitioner gave J.C. a pair of shorts and tee-shirt to put on, and J.C. returned to the living room to watch television. Petitioner then took a shower and came downstairs dressed only in a towel.

Petitioner told J.C. he could sleep in Petitioner's bedroom and Petitioner would sleep downstairs on the couch. During the night, J.C. woke up to find Petitioner lying beside him in bed rubbing J.C.'s penis. Petitioner penned J.C. to the bed with his arms and legs and engaged in fellatio. Although J.C. continued to struggle, Petitioner also forced J.C. to penetrate Petitioner anally. Petitioner then went downstairs, and J.C. fell asleep.

Early the next morning, the telephone rang, and J.C. answered it. The caller asked for Petitioner, and J.C. handed him the telephone. Petitioner then took J.C. back to Riverfront Park. Although he bought J.C. a coke on the way to the park, Petitioner did not buy J.C. any food or give him any money. Petitioner told J.C. he would meet him later that night, and J.C. spent the day walking through the stores by the park. Later that night, Petitioner found J.C. and told him that he was ordered to take J.C. to the Detention Center as a runaway. J.C. got in Petitioner's car again, but instead of taking him to the Detention Center, Petitioner drove J.C. back to his house in Bellevue.

That night, Petitioner ordered a pizza. After they finished eating, J.C. told Petitioner not to bother him, but Petitioner again held J.C. down and engaged first in fellatio then forced J.C. to penetrate him anally. After Petitioner was through, someone knocked on the front door, and Petitioner told J.C. to get in a closet. Instead, J.C. stood at the top of the stairs and listened to the men's conversation about swapping police radios and an upcoming party. After the man left, J.C. wrapped himself in a sheet so that Petitioner could not bother him again and went to sleep.

The next morning, Petitioner gave J.C. another set of clothes and then dropped him off at the Vanderbilt University campus where J.C. spent the day. Toward the end of the afternoon, J.C. walked back to Riverfront Park where he tried to find someone to help him. Later that night, J.C. told two men that he was supposed to meet his brother at Riverfront Park but he had not shown up. The men drove J.C. toward Bellevue ostensibly to find J.C.'s brother, but J.C. intended to tell them Petitioner had abused him when they reached Petitioner's house.

Eventually, when J.C. could not find Petitioner's house, the men drove him back downtown to the police station. The first police officer they encountered told the men to take J.C. back to Riverfront Park, and if J.C. was indeed a runaway, the police officer would go pick him up later. The men were reluctant to leave J.C. by himself and convinced J.C. to go with them to the Criminal Justice Building. By this time, J.C. was crying, and he was still crying while Officer Nicolas Marino attempted to find out who he was. Officer Marino brought J.C. something to eat and drink. J.C. told the officer a variety of stories but finally the police officers received information from Kentucky as to J.C.'s identity, and they confirmed that he was a runaway. As part of the booking process, the officer asked J.C. if anyone had abused him since he had run away. J.C. told him about Petitioner and gave a general description of "Mike." J.C. also said that "Mike" was a Metro Police Officer. J.C. was able to provide a detailed description of the inside of Petitioner's house and a general idea of where Petitioner's house was located.

Detective David Miller was called in to investigate J.C.'s allegations. He and J.C. drove toward Bellevue, and with the help of other officers in the area were able to locate Petitioner's house.

-3-

When they arrived at the condominium, the vehicle J.C. described was parked in front of the house. One of the officers stayed with J.C. in the car as Detective Miller and Sergeant Mark Chestnut approached the front door. Another uniformed officer went to the back of the house. When Petitioner opened the door, Sergeant Chestnut recognized him as a police officer.

J.C. indicated from the car that this was the man he had described, and the officers informed Petitioner about the allegations. Petitioner permitted the officers to search his house, and the officers verified that the premises matched J.C.'s description. Petitioner denied knowing J.C. but did admit that the boy was wearing his clothes. Petitioner said he did not know how J.C. got the clothes.

J.C.'s fingerprints were found on a bottle of cologne inside Petitioner's house and on the passenger side of Petitioner's car. A pair of shorts and a tee-shirt were retrieved from Petitioner's clothes hamper and sent for testing. The lab was unable to test the tee-shirt, and the shorts revealed many stains, including a semen stain that could have been from J.C. Samples of J.C.'s and Petitioner's saliva were determined to be indistinguishable.

Alberta Harris testified that she called Petitioner's house on July 28, the morning after J.C. first stayed with Petitioner, to tell Petitioner that his new police radio was ready to be picked up. She said that a young male answered the telephone, that she asked to speak to Petitioner, and Petitioner then came to the telephone.

Jeffrey White testified that he went to Petitioner's house between eleven o'clock and twelve o'clock in July, 1992 to discuss obtaining a new police radio for Petitioner and an upcoming party they planned to attend. Petitioner was dressed only in boxer shorts and seemed anxious for Mr. White to leave.

Petitioner also testified in his own defense. He stated that in July, 1992, he had been with the Metro Nashville Police Department for four months and was still on probation. Petitioner confirmed that he had spoken with Ms. Harris on July 28, but the man who answered the telephone was a friend of his, Daryl Witkowski. Mr. Witkowski had spent the previous night with Petitioner as he had on other occasions. Mr. Witkowski knew how to gain access to the house when Petitioner was not there and had permission to drive Petitioner's car. In 1992, Mr. Witkowski was in his early twenties and was of a similar height and weight as Petitioner with a receding hairline like Petitioner's.

Petitioner testified that the first time he saw J.C. was at his house in the company of police officers. He admitted that J.C. was wearing his clothes at that time but said he did not know how J.C. acquired the clothes or knew about his conversation with Jeff White. Petitioner stated that he had never invited J.C. into his home and did not know how J.C. could describe the condominium's interior in such detail. During the investigation, Petitioner voluntarily consented to the search of his car and condominium and underwent a rape analysis.

Based on this evidence, Petitioner was convicted of two counts of rape.

On March 30, 2001, Petitioner filed a petition for post-conviction relief. After counsel was appointed, his petition was amended and alleged that Petitioner received ineffective assistance of counsel at trial. Petitioner asserts that his counsel's conduct was deficient because counsel failed to (1) adequately advise Petitioner as to the consequences of proceeding to trial rather than accepting the plea agreement offered by the State; (2) request an instruction by the trial court as to assault and sexual battery as lesser-included offenses of rape; (3) adequately argue that the victim consented to the rapes which would support a jury instruction on statutory rape; (4) file a motion for a bill of particulars prior to trial; (5) request that the State make an election of offenses at the conclusion of the State's proof; (6) effectively impeach the credibility of the victim at Petitioner's second trial; and (7) preserve and appeal issues two, four, and five. Petitioner did not challenge his two convictions for official misconduct at the post-conviction hearing. Petitioner was represented by the same counsel at trial and on appeal.

At the post-conviction hearing, Petitioner called his father, Bobby Walton, as a witness and also testified on his own behalf. The State called as a witness Lionel Barrett, Jr., Petitioner's counsel at trial and on appeal.

Petitioner testified that Mr. Barrett gave him erroneous and inaccurate information concerning the consequences of proceeding to trial rather than accepting the State's plea bargain offer. In its offer, the State agreed to drop the rape charges if Petitioner would enter a plea of no contest on two counts of misdemeanor official misconduct. If Petitioner accepted the offer, he would receive a sentence of eleven months, twenty-nine days, which would be served on probation. When considering whether to accept the offer, both Petitioner and his father, Bobby Walton, said that Mr. Barrett advised Petitioner that the State had little evidence against him and that Petitioner's chances at trial were good. Moreover, even if Petitioner were convicted, Mr. Barrett told Petitioner that he would only have to serve thirty percent of his sentence as a Range I, standard offender before he was eligible for parole. Petitioner understood this to mean that in the event he was convicted he would only have to serve two to three years. Because of his lack of prior convictions and his service as a police officer, Mr. Barrett believed Petitioner would be granted parole as soon as he was eligible. Based on this information and the desire to clear his name, Petitioner decided to reject the State's plea bargain offer and proceed to trial.

Petitioner said that he first learned that he would be required to serve 100% of his sentence as a multiple rapist after he arrived at the Tennessee Department of Correction. He testified that Mr. Barrett had never advised him that if he were convicted on both counts of rape, Petitioner would be classified as a multiple rapist without the possibility of parole or the ability to earn sentence reduction credits. Petitioner thought that the imposition of a 100% sentence was a mistake, and he contacted Mr. Barrett to assist him in correcting the matter. Mr. Barrett responded that he would look into the Department of Correction files and determine how Petitioner's sentence was actually calculated.

On cross-examination, Petitioner denied that Mr. Barrett had begged him to accept the State's plea bargain offer. Petitioner also denied that his family had been instrumental in his decision to

proceed to trial, or that they wanted him to reject the offer primarily because his family, and particularly his mother, was unwilling to believe that Petitioner was guilty of the offenses.

Petitioner next testified that Mr. Barrett had never explained to him that the offense of rape, as charged against Petitioner, could include both anal and oral sex. The State introduced evidence of two acts of anal sex and two acts of fellatio, yet only charged Petitioner with two counts of rape. Petitioner said that he did not learn that Mr. Barrett could have required the State to elect which offenses it was proceeding on until after the trial. Mr. Barrett's failure to request an election of offenses, Petitioner believed, cast doubt on the unanimity of the jury's vote because some of the members could have convicted him based on the anal penetration, and others on the act of fellatio, as to each count of rape.

Petitioner also alleged that Mr. Barrett was deficient for not effectively impeaching the credibility of the victim at Petitioner's second trial on the two counts of rape. J.C. testified at both trials, but added certain information at the second trial that had not been mentioned at the first trial. J.C. testified that Petitioner told him he had to have sex with Petitioner as payment for the food bought by Petitioner. Petitioner said that Mr. Barrett did not bring the discrepancy in J.C.'s testimony to the attention of the jury. On cross-examination, Petitioner admitted that Mr. Barrett had elicited testimony that J.C. had lied repeatedly to the police officers and to the two men who found him at Riverfront Park. Mr. Barrett was also able to demonstrate to the jury that the victim was a persistent runaway who had stolen a car in order to get from Kentucky to Nashville.

Mr. Barrett testified that he had strongly urged Petitioner at three or four meetings to accept the plea bargain offer because the State's evidence against Petitioner was significant. Petitioner, however, consistently denied that he had any association with the victim and was unwilling to plead to any offense that was based on his alleged sexual misconduct. Mr. Barrett said that the decision to go to trial was made primarily by Petitioner and his mother, and they were adamant that Petitioner not plead guilty to a sexual misconduct charge. Mr. Barrett also said that he warned Petitioner that the parole board would likely consider the fact that the rapes were committed while Petitioner was dressed in his police uniform as a negative factor. Considering all of the circumstances under which the offenses were committed, Mr. Barrett said that he was pleased that the length of the sentences imposed by the trial court were at the minimum or low end of the range of punishment and considered the sentences very fair.

Mr. Barrett could not remember whether he had discussed the possibility that Petitioner would be sentenced as a multiple rapist if the jury convicted him on both counts of rape. After the trial court sentenced Petitioner as a Range I, standard offender, Mr. Barrett was aware that the judgment could be amended to classify Petitioner as a multiple rapist and believed he had discussed the possibility with Petitioner.

Mr. Barrett said that he did not think to ask for an election of offenses. However, in hindsight, Mr. Barrett said that he did not consider an election necessary and perhaps even ill-advised because Petitioner denied any sexual contact with the victim. Mr. Barrett said that either the jury

believed Petitioner or they believed the victim. In addition, Mr. Barrett did not file a bill of particulars because Mr. Barrett believed that the State was very forthcoming with the evidence they had collected.

Mr. Barrett stated that he could not specifically remember the embellishment in J.C.'s testimony but remembered assailing his credibility at every opportunity.

After the evidentiary hearing, the post-conviction court found that Petitioner had failed to show by clear and convincing evidence that counsel had provided ineffective assistance of counsel in advising Petitioner as to the consequences of a conviction for rape. In addition, the post-conviction court found that an election of offenses, based on the facts before it, was not necessary, and Petitioner's allegation based on this issue was without merit. Finally, the post-conviction court found that the evidence established that Mr. Barrett ably attacked the victim's credibility at trial. Petitioner, therefore, failed to establish that he had been prejudiced by Mr. Barrett's failure to call to the jury's attention the single discrepancy in the victim's testimony between the first and second trials. Accordingly, the post-conviction court denied Petitioner's petition for post-conviction relief.

## II. Standard of Review

The Sixth Amendment to the United States Constitution and Article I, § 9 of the Tennessee Constitution guarantee an accused the right to representation by counsel. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). In order to prevail on a claim of ineffectiveness of counsel, a petitioner must establish by clear and convincing evidence that (1) the conduct of petitioner's counsel fell below "the range of competence demanded of attorneys in criminal cases," and (2) that petitioner was adversely affected by counsel's deficient performance. *Baxter v. Rose,* 523 S.W.2d 930, 936 (Tenn. 1975); *Strickland v. Washington*, 466 U.S. 668, 693, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1974). In order to establish prejudice, the petitioner must show that there is a reasonable possibility that the outcome of the proceedings would have been different but for the ineffective assistance of counsel. *Id.,* 466 U.S. at 694, 104 S. Ct. at 2068. Because the petitioner must establish both deficient conduct and prejudice, relief will be denied if petitioner fails to prove either component. *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996).

The post-conviction court's findings of fact underlying a claim of ineffective assistance of counsel are reviewed de novo with a presumption that the findings are correct unless the preponderance of the evidence establishes otherwise. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). However, the application of the law to the court's factual findings, such as whether counsel's conduct was deficient or whether the petitioner was prejudiced, is reviewed de novo with no presumption of correctness. *Id.*

## III. Ineffective Assistance of Counsel

### A. Pre-Trial Advice

Petitioner alleges first that trial counsel's failure to advise Petitioner prior to trial that he would be sentenced as a multiple rapist if convicted of both counts of rape fell below the objective standard of competence required of criminal lawyers. Both Petitioner and his father testified that trial counsel advised Petitioner that the maximum punishment he faced if convicted of rape was eight to twelve years, of which Petitioner would have to serve 30% before he was eligible for parole. If trial counsel had advised him that he would be classified as a multiple rapist and required to serve his entire sentence if convicted of both counts of rape, Petitioner contends he would have accepted the State's plea bargain offer. Mr. Barrett testified that he strongly advised Petitioner to accept the State's offer over the course of three or four meetings, but that Petitioner and his family were adamant about not accepting a plea agreement based on the acceptance of a charge involving sexual misconduct. Mr. Barrett stated that he could not recall whether he advised Petitioner that he could be classified as a multiple rapist if convicted of both counts. However, Mr. Barrett advised Petitioner that the State's case was strong, and that Petitioner's status as a police officer when the offenses were committed would not be viewed favorably by the parole board.

Based on the evidence presented at the evidentiary hearing, the post-conviction court found that Petitioner had not established the ineffectiveness of his counsel's conduct by clear and convincing evidence. In reaching this finding, the post-conviction court accredited Mr. Barrett's testimony that he had strongly urged Petitioner to accept the State's plea agreement offer. The trial court concluded from the testimony that Petitioner apparently had no intention of admitting liability for sexual misconduct under any circumstances and was supported by his family in his decision to proceed to trial. Moreover, the post-conviction court noted that Petitioner's training gave him more experience with the legal system than the average person.

In a criminal proceeding, the accused may plead guilty, not guilty, or nolo contendere. Tenn. R. Crim. P. 11(a); *Parham v. State*, 885 S.W.2d 375, 379 (Tenn. Crim. App. 1994). The right to plead not guilty constitutionally includes the right to plead guilty, and both pleas must be available to the accused in a criminal case. *Lawrence v. State*, 455 S.W.2d 650 (Tenn. Crim. App. 1970). A plea must represent an intelligent and voluntary choice among the possible alternative courses of action available to the accused. *Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993) (quoting *North Carolina v. Alford*, 400 U.S. 25, 31, 91 S. Ct. 160, 164, 27 L. Ed. 2d 162 (1970). In determining whether a plea is voluntary, the reviewing court must look to such factors as "the relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision" to plead guilty or not guilty. *Blankenship*, 858 S.W.2d at 904, *citing Caudill v. Jago*, 747 F.2d 1046, 1052 (6th Cir. 1984).

Here, the post-conviction court accredited the testimony of Mr. Barrett and determined that Petitioner was not denied the effective assistance of counsel in determining whether to enter into a

plea agreement or proceed to trial, and that Petitioner's decision to reject the State's plea agreement offer was made intelligently and voluntarily. The evidence in the record does not preponderate against this finding, and Petitioner is not entitled to relief on this issue.

## B. Inadequate Cross-Examination

Petitioner alleges that his counsel failed to adequately cross-examine J.C. on the discrepancies between J.C.'s testimony in the first trial and that given at Petitioner's second trial. Specifically, Petitioner points out that J.C. testified at the second trial that Petitioner told J.C. he had to have sex with Petitioner as payment for the food Petitioner had bought. J.C. had not mentioned this fact at the first trial although he testified that he had no money and was hungry. The post-conviction court concluded that Mr. Barrett had ably attacked J.C.'s credibility at both trials, and that Petitioner failed to carry his burden of proving that he was prejudiced by Mr. Barrett's failure to specifically address this single incident of inconsistency.

The record does not indicate that Mr. Barrett's failure to address J.C.'s comment was a trial strategy based on inadequate preparation as Petitioner suggests. At the post-conviction hearing, Mr. Barrett testified that he simply did not recall that specific piece of testimony. However, Mr. Barrett also noted that he had explored in depth J.C.'s family and criminal background as well as the various stories he told law enforcement officials about the incidents on July 27 and July 28. Based on the record, we do not find that the evidence preponderates against the post-conviction court's finding that Petitioner failed to show prejudice.

## C. Election of Offenses

Finally, Petitioner alleges that his counsel rendered ineffective assistance of counsel when he failed to request the State to make an election as to which offenses it was relying upon to sustain Petitioner's two convictions for rape. Petitioner contends also that counsel's performance was deficient when he failed to raise the issue on appeal. In support of his allegation, Petitioner argues that the State introduced evidence as to four distinct and separate offenses, each of which, if proved, could independently support a conviction of rape. Because the State charged Petitioner with only two counts of rape, Petitioner contends that the State was required to elect which of the four offenses it was relying upon to sustain Petitioner's convictions under the Tennessee Supreme Court's decision in *State v. Kendrick*, 38 S.W.3d 566 (Tenn. 2001).

At the post-conviction hearing, the State essentially conceded that an election was warranted, but it argued that Petitioner had not shown that he was prejudiced by his counsel's failure to ensure that an election was made by the State. The post-conviction court, however, concluded that an election was not required under the facts presented in the case and denied Petitioner's request for post-conviction relief on this issue. We have carefully reviewed both the trial and post-conviction transcripts as well as the parties' arguments in this matter. For the following reasons, we find that Petitioner's counsel rendered ineffective assistance when he failed to request an election of offenses at the conclusion of the State's proof and again when he failed to raise the issue on appeal. Based

on the facts in this case, the State should have elected whether it was proceeding on the act of anal intercourse or the act of fellatio to sustain Petitioner's conviction for the alleged offense occurring July 27, 1992, and whether Petitioner's conviction for the alleged offense occurring on July 28, 1992 was based on the act of anal intercourse or the act of fellatio. Further, we find that Petitioner has met his burden of showing that he was prejudiced by such actions.

The election of offense doctrine has been addressed by the courts of this state on numerous occasions and was certainly an established concept at the time of Petitioner's trial. *See State v. Shelton*, 851 S.W.2d 134 (Tenn. 1993); *State v. Brown*, 762 S.W.2d 135 (Tenn. 1988); *Burlison v. State*, 501 S.W.2d 801 (Tenn. 1973); *State v. Brown*, 823 S.W.2d 576 (Tenn. Crim. App. 1991). In general, "when the evidence indicates that the defendant has committed multiple offenses against a victim, the prosecution must elect the particular offense as charged in the indictment for which the conviction is sought." *State v. Brown*, 992 S.W.2d 389, 391 (Tenn. 1999). The election is primarily intended to protect the defendant's right to a unanimous jury trial that is required under our state constitution. *Id.; Shelton*, 851 S.W.2d at 137; *Tidwell v. State*, 922 S.W.2d 497, 501 (Tenn. 1996). Whenever the State shows evidence of more offenses than the particular offense or offenses charged against the defendant, there is always a concern that some jurors will convict based on the existence of one offense, and others on the existence of an entirely different offense. *See Shelton*, 851 S.W.2d at 137. In effect, each juror is left to his or her own devices to determine "the act(s) of abuse upon which to base a verdict." *State v. Walton*, 958 S.W.2d 724, 727-728 (Tenn. 1997). This result has been aptly described variously as a "patchwork verdict" and a "'grab bag' theory of justice." *Brown*, 823 S.W.2d at 583, (quoting *United States v. Duncan*, 850 F.2d 1104, 1110 (6th Cir. 1988)); *Tidwell*, 922 S.W.2d at 501.

Because the election requirement is "fundamental, immediately touching the constitutional rights of the accused," an election of offenses is mandated whether or not the defendant requests an election. *Burlison*, 501 S.W.2d at 804. Rather, it is incumbent upon the trial court even absent a request from the defendant to ensure that the State properly makes an election in order to avoid a "'patchwork verdict' based on different offenses in evidence." *Shelton*, 851 S.W.2d at 137.

In 1993, the Davidson County grand jury, in two separate indictments, one for July 27, 1992 and the other for July 28, 1992, found that Petitioner "did engage in unlawful sexual penetration of [J.C.] and force or coercion was used to accomplish the act, in violation of Tennessee Code Annotated § 39-13-503." Neither indictment identified the offense by a particular type of penetration, although the term "sexual penetration" as relevant here, includes both anal intercourse and fellatio. Tenn. Code Ann. § 39-13-501(7).

At trial, J.C. testified that on July 27, 1992, Petitioner approached J.C.'s bed while he was sleeping and began to rub his penis with his hand. J.C. woke up and began struggling, but Petitioner held J.C. down on the bed with his arms and legs while he engaged in fellatio. Petitioner then changed positions and forced J.C. to penetrate him anally. No testimony was provided concerning how long either of the incidents lasted or as to the amount of time that elapsed between the first sexual act and the second. Both acts were repeated on the night of July 28. That is, Petitioner

forcibly held J.C. down while he first engaged in fellatio, then changed positions and forced J.C. to participate in anal intercourse. Once again, J.C. did not indicate the lapse between these acts.

At the post-conviction hearing, Petitioner relied on *Kendrick* to support his position that Mr. Barrett should have requested an election of offenses. The post-conviction court, however, concluded that an election of offenses was unnecessary in Petitioner's case because the two acts on each night occurred within a short span of time. *See State v. Johnson*, 53 S.W.3d 628 (Tenn. 2001) and *State v. Hodges*, 7 S.W.3d 609 (Tenn. 1998). In the court's view, the act of anal intercourse immediately followed the act of fellatio which presumably led the post-conviction court to conclude that only one offense occurred under the rationale of *Johnson.* In addition, the post-conviction court observed that J.C., at thirteen, was not the "type of victim" that usually generates a need for an election of offenses. First, Petitioner's offenses occurred within two days rather than the months or even years usually encountered in child sexual abuse cases. In addition, unlike cases involving a victim too young to identify a particular offense by a specific date, J.C., who was sixteen at the time of Petitioner's second trial, was very clear in his testimony as to what offenses occurred when. Accordingly, the post-conviction court found Petitioner's claim on this issue without merit.

Initially, we observe that an election of offenses does often arise in the context of sexual offenses against young children who have difficulty not only articulating the type of abuse they have endured but also with identifying the offense by date or time. *See e.g. Walton*, 958 S.W.2d at 726 (victim was in kindergarten when her father's abuse started)*; Shelton*, 851 S.W.2d. at 138-139 (victims included two seven-year-olds and one six-year-old). However, it is equally clear that an election is not limited to cases where the victim is below a certain age. In *Kendrick*, for example, the victim was an adult. *State v. Kendrick,* 38 S.W.3d 566 (Tenn. 2001). Moreover, an election of offenses certainly may be necessary outside the child sexual abuse arena. This Court's decision in *Brown*, for example, involved the failure of the State to specify which acts it was relying on to convict the defendant of possession of a controlled substance. *State v. Brown*, 823 S.W.2d 576 (Tenn. Crim. App. 1991). As noted above, the State must make an election of offenses any time it offers proof of more offenses than the number charged against the defendant. *See State v. Brown*, 992 S.W.2d 389 (Tenn. 1999). Therefore, the fact that J.C. at trial was a composed, articulate witness does not dispose of Petitioner's claim of ineffective assistance of counsel.

The post-conviction court's reliance on the Tennessee Supreme Court's decisions in *Johnson* and *Hodges* is also misplaced. In *Hodges*, a felony murder case, the supreme court concluded that the State need not elect which theory it is relying upon to sustain the defendant's conviction when it advances more than one theory of culpability to the jury. *Hodges*, 7 S.W.3d at 624. Similarly, in *Johnson,* the court found that the State does not have to elect which of the facts presented at trial it is relying upon to prove an element of the charged offense. *Johnson*, 53 S.W.3d at 633. In both cases, however, the defendant was charged with one offense, and the State offered proof of the existence of one offense. Whether the jury believed the defendant was guilty under one theory of culpability over another, or that one fact more clearly established an element of the crime than another, the jury could unanimously agree that the defendant was guilty of the charged offense.

In the case *sub judice*, the victim's testimony clearly established the elements necessary to find the existence of four distinct and separate offenses of unlawful penetration, each of which met the description of the charged offense in the indictments. The *Johnson* court specifically distinguished offenses involving sexual battery from those in which an unlawful penetration has occurred. *Johnson*, 53 S.W.3d at 634. Sexual battery, by definition, envisions that the improper sexual contact necessary to sustain a conviction may involve more than one unlawful touching. Therefore, "[if] the entire incidence of sexual contact occurs quickly and virtually simultaneously, then only one [sexual battery] has occurred, even if more than one touching has occurred." *Id.* at 633. However, "generally rape is not a continuous offense, but each act of intercourse constitutes a distinct and separate offense.'" *Phillips*, 924 S.W.2d 662, 664, (quoting 75 C.J.S. *Rape* § 4 (1952 & Supp. 1995)).

More relevant to Petitioner's case is the Tennessee Supreme Court's decision in *State v. Kendrick*. 38 S.W.3d 566 (Tenn. 2001). In *Kendrick,* the defendant forced the victim into his car and proceeded to drive around the vicinity. Eventually, the defendant stopped and forced the victim to perform fellatio on him. He then drove for another five or ten minutes before stopping again and forcing the victim to engage in vaginal intercourse. The State charged the defendant with one count of aggravated rape. The defendant challenged his conviction, alleging that the State's failure to elect which incidence of aggravated rape it was relying upon to convict the defendant was plain error entitling him to a new trial. The supreme court agreed.

The supreme court first observed that "[t]his Court has long and consistently held that 'when the evidence indicates [that] the defendant has committed multiple offenses against a victim, the prosecution must elect the particular offense as charged in the indictment for which the conviction is sought.'" *Id.* at 568 (quoting *State v. Brown*, 922 S.W.2d 389, 391 (Tenn. 1999)). Without an election of offenses, the defendant's constitutional right to a unanimous jury trial is compromised. *Id.*

The *Kendrick* court rejected the State's argument that the acts of fellatio and vaginal intercourse were so close in time as to constitute one continuous offense. The definition of "sexual penetration" specifically lists both acts as separate offenses. *Id.* at 568-569; Tenn. Code Ann. § 39-13-501(7). When faced with the presence of more than one sexual offense, the following factors are relevant in determining whether the acts represent multiple offenses each capable of sustaining a conviction or one single violation: "the nature of the acts; the area of the victim's body invaded by the sexually assaultive behavior; the time elapsed between the distinct conduct; the accused's intent; and the cumulative punishment imposed." *Id.* at 569 (quoting *State v. Phillips*, 924 S.W.2d at 665). Under this analysis, the acts of fellatio and vaginal intercourse present in *Kendrick* were separate, distinct offenses mandating an election of offenses. *Id.* Accordingly, the State's failure to elect the offense for which it sought conviction violated the defendant's right to a unanimous jury trial. *Id.* at 570.

In the case *sub judice*, J.C. testified that Petitioner engaged in fellatio, then anal intercourse on July 27, and repeated both acts on July 28. Each act required a different position and a different

orifice. *See Phillips*, 924 S.W.2d at 665. Further, each act required a "purposeful act" of Petitioner and was "capable of producing its own attendant fear, humiliation, pain and damage to the victim." *Id.* Therefore, we conclude that the two unlawful sexual penetrations perpetrated against J.C. on two consecutive nights constitute four separate offenses. Accordingly, an election of offenses was mandatory, and the State was required to elect whether it was proceeding on the act of anal intercourse or the act of fellatio to sustain Petitioner's conviction for the alleged offense occurring on July 27, and whether it was proceeding on the act of anal intercourse or the act of fellatio to sustain Petitioner's conviction for the alleged offense occurring on July 28. Counsel's failure to request an election or raise the State's failure to make an election of offenses on appeal constitutes ineffective assistance of counsel.

Although we conclude that counsel's conduct was deficient at trial and on appeal, a petitioner raising a claim of ineffective assistance of counsel in a post-conviction proceeding must also show that he was prejudiced by his counsel's deficient conduct. *Strickland,* 466 U.S. at 694, 104 S. Ct. 2068. That is, his counsel's ineffective assistance must undermine our confidence in the reliability of the trial's outcome. *Id.* The State argues that Petitioner was not prejudiced by the failure to elect offenses because he denied any involvement, sexual or otherwise, with the victim. In other words, either the jury believed the victim totally or they believed Petitioner. An election, the State contends, would have made no difference in the result. Mr. Barrett, at the post-conviction hearing, echoed the State's argument, observing that an election in a case where the defendant pleads innocent is essentially academic. Notwithstanding counsel's hindsight, Mr. Barrett testified that he simply did not consider requesting an election of offenses.

The State's position is not supported by case law. In *Kendrick*, the court specifically rejected "the State's argument that the failure to comply with the election requirement was harmless simply because the jury rejected the defendant's alibi defense and accredited the victim's testimony." *Kendrick*, 38 S.W.3d at 569. In *Kendrick*, the court quoted *Shelton* that:

> It has been suggested that when a defendant denies all sexual contact with the victim, but the proof is sufficient to support guilty verdicts beyond a reasonable doubt on all of the offenses in evidence, an election is unnecessary . . . . [A]n appellate court's finding that the evidence is sufficient to support convictions for any of the offenses in evidence is an inadequate substitute for a jury's deliberation over identified offenses."

*Id.* (quoting *Shelton*, 851 S.W.2d at 138.) *See also Tidwell*, 922 S.W.2d at 502.

A not guilty plea does not release the defense counsel, the trial court, or the prosecutor from an obligation to ensure that an accused's right to a unanimous jury verdict is safeguarded. Indeed, regardless of the defendant's not guilty plea, the fact that the State proves every offense offered into evidence is the very situation that mandates an election. *Tidwell*, 922 S.W.2d at 501. This approach is exactly the "'grab bag' theory of justice" that an election of offenses avoids. *Id.* "Because all such

offenses will have been 'proven,' the jury may, in effect, reach into the brimming bag of offenses and pull out one for each count." *Id*.

In the case *sub judice*, the jury had the opportunity to observe the demeanor and body language of both Petitioner and J.C. as they testified about the events occurring on July 27 and July 28, 1992. The State also introduced physical evidence as to the four offenses which varied as to the materials tested and the quality of the results. From the facts and record, we cannot conclude that the jury unanimously arrived at its verdict by each juror finding the existence of the same offense beyond a reasonable doubt. Accordingly, our confidence in the reliability of the trial result has been undermined. *See Tidwell*, 922 S.W.2d at 502.

It is also important to note that had defense counsel raised this issue on appeal, either through a motion for a new trial or as plain error, the case law indicates that a reversal of Petitioner's convictions would have been warranted. *See State v. Kendrick*, 38 S.W.3d 566 (Tenn. 2001) (prosecutor's failure to elect offenses constituted plain error). *See also State v. Walton*, 958 S.W.2d 724 (Tenn. 1997); *State v. Shelton*, 851 S.W.2d 134 (Tenn. 1993); *Burlison v. State*, 501 S.W.2d 801 (Tenn. 1993); *State v. Hoyt*, 928 S.W.2d 935 (Tenn. Crim. App. 1995).

The result of counsel's deficient conduct in this matter could have easily been avoided if the trial court had required the State to make an election or the State, on its own initiative, had followed the dictates of well-established case law and spoken up to make an election of a particular offense for each charge. This is not a matter of the trial court or the prosecutor doing the trial counsel's job. The necessity of requiring the State to make an election of offenses is constitutionally driven. *Burlison*, 501 S.W.2d at 804. Once the State has introduced evidence of multiple offenses, the trial court has the duty to require the State to make an election of offenses. *Id*.

As this Court has previously observed when faced with a similar failure to elect offenses:

> We note, not for the first time, that the results of cases such as this are all the more tragic because often they are easily preventable. The appellate courts have repeatedly held that the State must elect between multiple offenses, and the appellate courts have repeatedly emphasized that trial judges must ensure that the election is properly made. (*Cites omitted)*. It has been twenty-seven years since *Burlison* was decided. There is absolutely no reason in a case such as this for the State to fail to properly elect between offenses and for the trial court to fail to inform the jury of the election.

*State v. Herring*, 2000 Tenn. Crim. App. LEXIS 684, No. M1999-00776-CCA-R3-CD (Tenn. Crim. App., Nashville, 2000), *perm. to appeal denied* (Tenn. 2001).

**CONCLUSION**

We affirm the post-conviction court's judgment denying post-conviction relief to Petitioner on the basis that his counsel rendered ineffective assistance in providing accurate trial advice and adequately cross-examining the victim. We reverse the judgment of the post-conviction court finding that counsel's conduct was not deficient for failing to request an election of offenses or raise the State's failure to make an election on appeal and that Petitioner was not prejudiced by such omission. Accordingly, Petitioner's convictions for rape are set aside, and the charges are remanded for a new trial.

 

_____
THOMAS T. WOODALL, JUDGE