IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs July 14, 2009

## STATE OF TENNESSEE v. MARKTRAIL LEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. 07-03893     W. Mark Ward, Judge**

---

**No. W2008-02278-CCA-R3-CD  - Filed August 21, 2009**

---

The defendant, Marktrail Lee, was convicted of aggravated child abuse and aggravated child abuse by neglect.  The trial court merged the two convictions and sentenced the defendant as a Range I offender to twenty-three years at 100 percent.  On appeal, the defendant asserts that the evidence is insufficient to support his convictions and that the court erred in sentencing.  Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ., joined.

Robert Wilson Jones, District Public Defender; Barry W. Kuhn (on appeal) and Amy Mayne and Sherrye Brown (at trial), Assistant Public Defenders, for the appellant, Marktrail Lee.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; William L. Gibbons, District Attorney General; and Marianne Bell and Robert Carter, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### FACTS

The defendant was convicted of seriously and permanently injuring his son, who was less than three months old at the time.

The victim's mother, Erica Warren, testified that she became pregnant with the victim shortly after meeting the defendant.  They moved into the home of the defendant's parents, where they had their own bedroom.  The defendant's cousin, Marilyn Strong, and her three children also lived in the home.  Warren cared for the victim during the day, and the defendant did so at night, both feeding the victim and changing his diapers.  Warren said that the defendant sometimes mocked the victim when he cried and once accused the victim of purposefully urinating on him.

Warren said that on February 7, 2007, the victim acted normal and she last fed him at 10:00 p.m. She went to bed between 11:00 p.m. and midnight, sleeping on the side closest to the wall, with the defendant on the side closest to the victim's crib. Warren awoke at approximately 4:00 a.m. the following morning and saw that the victim was not in his crib. As she went into the living room to look for the victim, she saw emergency vehicles leaving. The defendant, who was in the kitchen smoking a cigarette, told her that he had called emergency services because the victim had milk flowing out of his nose and was barely breathing. Warren called her sister for transportation to the hospital, and the defendant joined them. As soon as they arrived at the emergency room, nurses began questioning them about the victim's injuries. Warren said she and the defendant were arrested at the hospital, and she later gave a statement to the police and was released.

Describing the victim's appearance when she saw him at the hospital, Warren said that he had bruises on his forehead, his hand was swollen and purple, and a cast was being placed on his leg. The victim was not breathing on his own and was unconscious. A shunt was subsequently placed in his brain to remove fluid and blood. Warren said that, as a result of the victim's injuries, he will have to take medication for seizures and muscle spasms for the rest of his life and that he requires physical therapy every day.

Marilyn Strong testified that in February 2007 she and her three children were living in the home of her cousin, Patricia Johnson, who was the defendant's mother. On February 7, 2007, Strong got off work at 11:00 p.m., picked up her children from a babysitter, and saw no one up when she arrived home between 12:30 and 1:00 a.m. Strong said that Johnson and her husband, who were over-the-road truck drivers, were not home at the time.

Beverly Johnson, Warren's sister, testified that she drove Warren and the defendant to the hospital on the morning of February 8, 2007. The defendant did not say anything to her about what had happened.

Vickie Mabon-Partee testified that she was employed by the City of Memphis Fire Department Dispatch and received a 9-1-1 call from the victim's residence on February 8, 2007 at 3:54 a.m. The man with whom she spoke was calm and relaxed and told her that the victim was having difficulty breathing and was not alert. John Sanders, a paramedic with the Memphis Fire Department, testified that he was dispatched to the victim's home at 3:54 a.m., arriving at 4:05 a.m. He spoke with a man who was carrying a garbage can from the residence, who indicated that the problem was inside the house. Sanders entered the house and found the victim, gasping for breath, on the couch in the living room. He said that the victim was taking fewer than ten breaths a minute and that his breathing was agonal. Sanders observed that the victim had facial trauma and bruises to the upper body. He saw no bottle or milk near the victim and said the victim was posturing, as might be caused by a head injury. Otherwise, the victim was not responsive to Sanders' examination. Sanders offered to allow the man with whom he had first spoken ride with the victim to the hospital, but the man declined to do so.

Otice Spears, Jr., a paramedic with the Memphis Fire Department, testified that his ambulance arrived on the scene at 4:10 a.m., and he observed that the defendant was quiet and calm

in a nonchalant sort of way. As the victim was being transported to the hospital, Spears noticed a bruise on the right side of the victim's face and skin irritation on his hands and arms.

Dr. Frederick Boop testified that he was chief of pediatric neurosurgery at Le Bonheur Children's Hospital and was on duty when the victim arrived. He said that the victim was basically comatose and experiencing agonal respirations, which was a breathing pattern of patients close to death. The victim's pupils were small and sluggishly reactive, and he had burns on the back of his right hand, a broken right leg, and bruises on the right side of his neck around the collarbone. CT scans showed that the victim had sustained a severe brain injury within two to four hours of his arrival at the emergency room. The victim's brain was bleeding into his skull and into the dural space separating the two hemispheres of the brain. The effect of this was that the victim's brain was dying. Although the victim was given medication, irreversible damage already had occurred. CT scans taken four days later showed that the victim's brain had been deprived of oxygen for a significant period of time. Dr. Boop testified that the lack of oxygen could have been caused by strangulation, severe shaking, or a combination of these. He said that the victim was dying when he reached the emergency room.

Dr. Boop said that, as the victim's brain died, fluid began collecting in his skull, which put additional stress on the living tissue that remained. A shunt was installed to drain the excess fluid from the victim's brain into his stomach. As the result of his injuries, the victim will be able to eat, breathe, and smile but never will be able to talk, see, or understand what he hears. Only his brain stem now functions. Dr. Boop opined that the victim will require around-the-clock care for the rest of his life.

Lieutenant Evertina Halfacre with the Memphis Police Department testified that in February 2007 she was assigned to the Child Abuse Unit. She was dispatched to Le Bonheur Children's Hospital on February 8, 2007, and observed that the victim had a broken leg, swelling and burns to his hand, bruises on his face, and bruises in the shape of fingers around his neck. Later that day, she interviewed the victim's mother and the defendant after advising them of their rights. The defendant agreed to give a statement which was tape-recorded. The defendant told her that he fed the victim, went to use the bathroom, and, upon his return, found the victim with milk coming from his nose. He said he sprinkled water on the victim's hand and noticed that the victim's leg was swelling. The defendant admitted that he had been in total control of the victim during the time the injuries occurred but denied that he inflicted the injuries.

Dr. Karen Lakin, a pediatrician and medical director for the Child Assessment Program at Le Bonheur Children's Hospital, testified that the victim was in extremely critical condition when he was admitted to the hospital on February 8, 2007. The victim had second-degree burns on his right hand, significant bruising on his face and neck, and obvious swelling. Dr. Lakin said that the bruises on the victim's neck were "[m]ost likely" caused by fingertips and opined that the burns on his hand were caused by a hot liquid. The victim had bleeding over both lobes of the brain and behind his eyes, as well as a broken right femur which would have required a significant amount of force to fracture. She said the victim was hospitalized for nineteen days, eight of which he was on a ventilator. In Dr. Lakin's opinion, the victim's injuries were not consistent with accidental trauma and the "combination of injuries is such that and the severity is such that it would have to take very

violent actions." As a result of the victim's injuries, his motor and cognitive capabilities are severely limited and he is blind.

The defendant did not testify at trial and, otherwise, presented no evidence.

## ANALYSIS

### I. Sufficiency of the Evidence

On appeal, the defendant argues that the evidence was not sufficient to sustain his conviction for aggravated child abuse. As we will explain, we disagree.

In considering this issue, we apply the familiar rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Tennessee Code Annotated section 39-15-402 sets out the elements of aggravated child abuse:

(a) A person commits the offense of aggravated child abuse or aggravated child neglect or endangerment, who commits the offense of child abuse, as defined in § 39-15-401(a), or who commits the offense of child neglect or endangerment, as defined in § 39-15-401(b), and:

　　　　(1) The act of abuse or neglect results in serious bodily injury to the child;

　　　　(2) The act of neglect or endangerment results in serious bodily injury to the child;

　　　　(3) A deadly weapon, dangerous instrumentality or controlled substance is used to accomplish the act of abuse, neglect or endangerment; or

　　　　(4) The act of abuse, neglect or endangerment was especially heinous, atrocious or cruel, or involved the infliction of torture to the victim.

　　　　(b) A violation of this section is a Class B felony; provided, however, that, if the abused, neglected or endangered child is eight (8) years of age or less, or is vulnerable because the victim is mentally defective, mentally incapacitated or suffers from a physical disability, the penalty is a Class A felony.

The evidence in this matter, taken in the light most favorable to the State, showed that as the victim's mother put him to bed on February 7, 2007, he was in normal health. The other persons in the house were the defendant, who was to care for the victim during the night, and Marilyn Strong and her three children, all of whom were sleeping. Despite the victim's obvious physical problems, the defendant did not awaken any of the other persons in the house for assistance. When the victim arrived at the hospital, he had burns on the back of his right hand, bruises around his collarbone, and a broken right leg. CT scans showed that the victim had sustained a severe brain injury two to four hours prior to his arrival at the emergency room. Dr. Boop testified that the victim's injuries were consistent with strangulation, severe shaking, or both. As a result of these injuries, the victim never will be able to talk, see, or understand what he hears. Only his brain stem functions.

By its verdict, it is apparent that the jury accredited the testimony of the State's witnesses, concluding that the defendant was responsible for the injuries to the victim, and the record supports this determination.

## II. Sentencing

The defendant argues that the trial court used inapplicable enhancement factors in sentencing him. The record shows that the trial court carefully considered the sentencing factors:

The defendant is before me convicted of aggravated child abuse in two counts. These are A felonies sentencing as a Range One offender because of his lack of prior felony convictions. The sentence range is in between fifteen and twenty-five years.

As far as enhancement factors are concerned, I do find the following enhancement factors:

"No. 1, the defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range."

The defendant does have one prior misdemeanor conviction, and I will place weight upon this factor, but I will not place great weight on . . . this factor.

"No. 4, the victim of the offense was particularly vulnerable because of age or physical or mental disability."

In this situation, the child was two months and nine days old, which I find to be extremely young, and by virtue of this age the child was incapable of resisting the various attacks. Also incapable of summoning help, and obviously, could not have testified in this matter.

I think all three of those are applicable in this particular case, and I also think that this particular aggravator is appropriate for this offense. There's an unreported, Singo v. State, . . . 2007 Westlaw 1836050 Court of Criminal Appeals from 2007. It stands for the proposition that the fact that an offense can only be committed against a child does not preclude application of this particular factor.

And I think it is appropriate to the offense, and I also think that the defendant took advantage of this extremely young age in the course of the various attacks that were committed against this child. So I think this is an applicable enhancement factor.

I also find that . . . the next two enhancement factors are – this is Factor No. 5, exceptional cruelty[,] and No. 6[,] . . . particularly great personal injuries. These enhancement factors have caused a great deal of concern in their application in the appellate courts, and obviously, from a lay person's standpoint, I find that both of these are applicable. The defendant did treat the victim with exceptional cruelty, and I do find that the personal injuries were particularly great.

On first blush of reading of those, those seem to be clearly applicable in the case. As I was mentioning though, these courts have had a great deal of difficulty

applying these particular enhancement factors because of concepts, number one, are these enhancement factors inherent in the offense. Are they – there's one thing to consider[,] are they inherent in all of these aggravated child abuse cases[?]

And the second thing is are they essential elements of these aggravated child abuse cases, and they've caused a great deal of concern in their applications so I need to be extremely careful in these. I am going to apply No. 5:

> "The defendant treated or allowed the victim to be treated with exceptional cruelty during the commission of the offense."

And for this factor to appl[y], I must find a culpability distinct from and appreciably greater than that incident to the crime, and I am cognizant that the crime for which the defendant has committed requires serious bodily injury.

. . . .

A number of cases have seemed to apply this, but – and to apply it there must be something over and above the serious bodily injury that's required, and you can see how theoretically speaking you can treat someone in an exceptional[ly] cruel way or you can commit serious bodily injury without treating someone . . . in an exceptional[ly] cruel way. These are not synonymous factors at all.

And in this particular case we have I think ample evidence of treating this child in an exceptional[ly] cruel manner, and I'm not just talking about the multiple injuries inflicted or the seriousness of those injuries, and I'm not just talking about permanent brain injuries or the fracture to the leg, or the burns. We have multiple injuries that's also a factor, but not just that alone.

We have this gentleman who is taking the garbage out when the emergency personnel arrive at the scene instead of being by the child's side, and we have a gentleman who had an opportunity to wake the [victim's] mother and another lady who was in the house to help render assistance and didn't take that opportunity.

And we have a gentleman who, according to the proof, did not do anything but stand there when the emergency personnel were trying to treat the victim and chose not, even though requested to do so, to ride with the child to the hospital. I think we have a number of things here in this case that make this exceptional cruelty over and above just the fact that serious bodily injury is needed.

I do find a culpability distinct from and appreciably greater than that incident to the crime. So I'm going to find that particular enhancement factor.

. . . .

The [S]tate has also asked me to consider and apply:

"That the defendant abused a position of public or private trust."

And I think that's clear in this particular case and it's not in dispute that[] this was a position of private trust that was abused in this family relationship that exi[s]ted in this situation.

. . . .

When talking in terms of confinement, I should apply confinement when it's necessary to avoid depreciating the seriousness of the offense.

These are some of the factors that I've taken into consideration of this particular matter. I do find the presence in this case of one, two, three, four enhancement factors. I don't find any mitigating factors applicable. I will note that the defendant has no record of prior violent criminal activities so I will place weight on that as a non-statutory mitigating factor.

I don't place a great deal of weight on Factor 1[,] his previous history of criminal convictions. I do place a great deal of weight on Factor No. 4, "The victim of the offense was particularly vulnerable because of age," and on Factor No. 5, the exceptional cruelty committed in the course of this.

All these factors considered, I'm going to sentence the defendant to a term of imprisonment in the Tennessee Department of Correction[] twenty-three years.

. . . .

. . . And we're going to merge those. I'm going to sentence him to twenty-three years on each, but I'm going to merge those two convictions together.

. . . .

In determining this sentence, I have considered the evidence presented at trial and this sentencing hearing, the pre-sentence report, which I've made an exhibit, the principles of sentencing, and the arguments made as to sentencing alternatives, the nature and characteristics of the criminal conduct involved, the evidence and information offered by the parties on mitigating and enhancement factors, any statistical information provided by the AOC as to sentencing practices, any statement

that the defendant made in his own behalf and his potential for rehabilitation and treatment.

And I guess . . . if he had any significant record at all, he'd be getting the twenty-five years, but I think all things considered, I'll give him the twenty-three, and we'll set this for a motion for a new trial[.]

In sentencing the defendant, the trial court applied factor (1), the defendant had a previous history of criminal convictions, which was not given great weight; factor (4), the victim was particularly vulnerable because of age; factor (5), the defendant treated the victim with exceptional cruelty; and factor (14), the defendant abused a position of trust. See Tenn. Code Ann. § 40-35-114(1), (4), (5), (14).

As we will explain, we find that each of these factors was applicable. The defendant does not dispute application of factor (1), which, as we have said, the court gave little weight.

As for factor (4), our supreme court explained in State v. Adams, 864 S.W.2d 31, 35 (Tenn. 1993), that "[the child's age] alone does not prohibit the use of the vulnerability enhancement factor. The reason is that the relevant inquiry is not simply whether the victim is under the age of thirteen, but instead whether the victim was *particularly vulnerable* because of age or physical or mental disability." In this matter, the victim was less than three months old. Accordingly, we conclude that the factor was applicable.

As to factor (5), exceptional cruelty, this court has upheld application of this factor in an aggravated child abuse case, State v. Hodges, 7 S.W.3d 609, 631 (Tenn. Crim. App. 1998). In making the determination, this court relied upon the conclusion of our supreme court that "the element of 'serious bodily injury,' as included in the offense of especially aggravated robbery, does not necessarily constitute 'exceptional cruelty.'" Id. (quoting State v. Poole, 945 S.W.2d 93, 98 (Tenn. 1997)). Additionally, Poole explained that "the facts in a case may support a finding of 'exceptional cruelty' that 'demonstrates a culpability distinct from and appreciably greater than that incident to'" the charged offense. 945 S.W.2d at 98. In this matter, the victim was shaken, strangled, and burned; and, as the trial court explained, the defendant "did not do anything but stand there when the emergency personnel were trying to treat the victim and chose not, even though requested to do so, to ride with the child to the hospital." We agree with the trial court that this factor was applicable.

As for enhancement factor (14), the defendant abused a position of trust, our supreme court concluded in State v. Gutierrez, 5 S.W.3d 641, 645 (Tenn. 1999), that "[w]here the adult perpetrator and minor victim are members of the same household, the adult occupies a position of 'presumptive private trust' with respect to the minor." We conclude that the trial court properly applied this factor in sentencing the defendant.

**CONCLUSION**

Based upon the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE